[918 NE2d 107, 889 NYS2d 517]

In the Matter of CRUCIBLE MATERIALS CORPORATION et al., Respondents, v NEW YORK POWER AUTHORITY, Appellant.

Argued September 9, 2009; decided October 20, 2009

POINTS OF COUNSEL

*Terryl Brown Clemons, General Counsel, New York Power Authority,* White Plains (*Eileen P. Flynn* and *Arthur T. Cambouris* of counsel), for appellant. I. As the statute plainly requires, the rebate's base year is the final year of the Power for Jobs program customer's power contract. (*Sega v State of New York,* 60 NY2d 183; *Matter of Malta Town Ctr. I, Ltd. v Town of Malta Bd. of Assessment Review,* 3 NY3d 563; *Matter of Partnership 92 LP & Bldg. Mgt. Co., Inc. v State of N.Y. Div. of Hous. & Community Renewal,* 46 AD3d 425.) II. Economic Development Law § 189 (a) (5) does not provide respondents with both restitution and rebate benefits. (*McKechnie v Ortiz,* 132 AD2d 472; *Woollcott v Shubert,* 217 NY 212; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577.)

*Couch White, LLP,* Albany (*James J. Barriere, Robert M. Loughney, Michael T. Wallender* and *Nathan R. Sabourin* of counsel), for respondents. I. In enacting the 2006 Power for Jobs program amendments, the Legislature provided manufacturing participants with a retroactive "restitution" benefit and a prospective "rebate" benefit. (*Patrolmen's Benevolent Assn. of City of N.Y. v City of New York,* 41 NY2d 205; *Matter of Astoria Gas Turbine Power, LLC v Tax Commn. of City of N.Y.,* 14 AD3d 553, 7 NY3d 451; *People v Ryan,* 274 NY 149; *N.Y.A.A.D., Inc. v State of New York,* 1 NY3d 245; *Matter of Greer v Wing,* 95 NY2d 676; *Matter of OnBank & Trust Co.,* 90 NY2d 725; *Matter of Knight-Ridder Broadcasting v Greenberg,* 70 NY2d 151.) II. Rebates for phase 5 Power for Jobs program participants are measured by 2005 electric rates.

## OPINION OF THE COURT

Graffeo, J.

This case involves a controversy between the New York Power Authority (NYPA) and manufacturers that participate in the Power for Jobs (PFJ) program. At issue is the proper interpretation of certain 2006 amendments to Economic Development Law § 189.

The Power for Jobs program was originally enacted in 1997 to ameliorate the effects of energy deregulation, which had led to increases in energy costs and unpredictable price fluctuations. The initiative authorizes NYPA to procure electricity from power producers and make it available to businesses that elect

to enter into PFJ contracts; the contracts ensure that the businesses will receive a certain quantity of power at a predetermined price during a prescribed time period. In exchange for receiving electricity at guaranteed prices, the businesses agree to remain in New York and, in some cases, commit to the creation of additional jobs. The objective of the program is to assist manufacturers and other commercial enterprises in their efforts to remain competitive despite New York's relatively high-priced energy market. Although the legislative expectation is that NYPA will supply power at below-market rates, the contracts do not guarantee that result.

The program, which is codified at Economic Development Law § 189, was initially scheduled to continue for only three years but has been repeatedly extended and amended by the Legislature. When the program commenced, businesses entered into contracts with NYPA for a three-year term and each of the first three years was referred to as a "phase" with participants deemed phase one, two or three depending on the year of their first contract. In 2000, the program was amended to add a fourth phase that permitted phase one participants—whose three-year contracts were expiring—to extend their contracts. As a result of 2002 legislation, a fifth phase was authorized whereby phase two and three customers were similarly offered contract extensions. Although the PFJ program has been extended since 2002, the Legislature has not characterized these subsequent extensions as new sequential "phases" and, as a result, the last phase was phase five, which ended in December 2005 (see Economic Development Law § 189 [e] [3]).

In 2004, the Legislature again continued the program but made significant changes so that participants were given the option of either extending their contracts or letting them expire in order to join an "electricity savings reimbursement" program, referred to as the Rebate Program (see Economic Development Law § 189 [a] [5], as added by L 2004, ch 59, part T, § 3). Under this alternative to the PFJ contract, a business would purchase power directly from a local power company and would be reimbursed by NYPA for costs paid to the local provider that exceeded the unit cost of power that the business had paid under phase four or five of the program. In other words, the rates paid under the PFJ contract would become the baseline that prospective power costs would be measured against and NYPA would have to cover—in the form of a rebate—any excess energy costs the businesses incurred when purchasing from local

providers. This Rebate Program ensured that businesses that had previously participated in the PFJ contract program could obtain specified amounts of electricity at prices at least as favorable as those they paid under their expired contracts.

In 2006, due to market fluctuations, some PFJ contract businesses incurred higher costs for energy secured through NYPA than they would have paid if they had purchased power directly from their local providers. To address this situation, in August 2006, Economic Development Law § 189 was amended yet again (*see* L 2006, ch 645, § 3). As had occurred in the past, the amendment continued the PFJ contract program by allowing extensions of contracts for an additional six months (setting a new sunset date of June 30, 2007) and authorized businesses to let their contracts lapse and opt instead to participate in the Rebate Program.

But the 2006 legislation added an additional paragraph to Economic Development Law § 189 (a) (5) that accomplished two things. First, it created a new Restitution Benefit for participants that had paid higher energy costs under their PFJ contracts than they would have paid by purchasing from local providers. The Legislature required NYPA to reimburse such participants for the difference in costs retroactive to January 1, 2006. Second, it provided a specific benefit to a subset of PFJ participants—manufacturers—allowing manufacturers that had renewed their contracts to withdraw their renewals and convert to the Rebate Program without having to wait until their contracts expired. What the 2006 amendment did not do, however, was amend the rebate calculation language from the 2004 legislation, meaning that it continued to use the rates charged in the last year of the phase four and five contracts as the baseline for determining rebates.

After the effective date of the 2006 amendments, NYPA—which had opposed this legislative proposal (*see* NYPA letter in opposition, Bill Jacket, L 2006, ch 645, at 20-24)—advised PFJ participants of the change in the law and gave its interpretation of the statutory amendments. In November 6, 2006 correspondence, NYPA notified manufacturers with PFJ contracts that they had 10 days to make a choice between continuing their contracts and obtaining the Restitution Benefit or ending their contracts and joining the Rebate Program. NYPA further explained how rebates would be calculated, stating that it intended to use the price that participants paid under their contracts during the 12 months preceding conversion to the

Rebate Program—which would be calendar year 2006 for most participants—to determine the baseline against which new energy costs would be compared to determine whether a rebate was warranted. Finally, NYPA informed participants that restitution payments would not be made until the last quarter of 2007.

Petitioners Crucible Materials Corp. and Syracuse Castings Sales Corp., along with other similarly-situated manufacturers, immediately objected to NYPA's interpretation of the 2006 amendments, arguing that NYPA had incorrectly read the legislation to require participants to elect between the Restitution Benefit and the Rebate Program when the Legislature had intended that manufacturers should be able to take advantage of both benefits. They also complained about the use of calendar year 2006 as the baseline for determining whether payments would be forthcoming under the Rebate Program, contending that NYPA's view was inconsistent with the language in the statute and severely undermined the value of the Rebate Program because 2006 was the year contract participants paid above-market prices. And they further disagreed with NYPA's decision to delay restitution payments until late 2007. Given the short deadline provided by NYPA, however, Crucible Materials and Syracuse Castings both chose to continue their contracts and obtain the Restitution Benefit, albeit under protest.

In February 2007, petitioners commenced this timely CPLR article 78 proceeding challenging NYPA's determination under Economic Development Law § 189 (a) (5), repeating the points asserted in the letter of complaint. After NYPA answered, Supreme Court dismissed the petition in its entirety, crediting NYPA's interpretation of the amendments. The Appellate Division modified by granting the petition in part (50 AD3d 1353 [2008]). It agreed with petitioners that the 2006 amendments authorized manufacturers to take advantage of both the Restitution Benefit and the Rebate Program. It further concluded that NYPA erred in selecting 2006 as the baseline for calculating rebates, resting its decision on the language of the rebate calculation provision. However, the Appellate Division upheld as neither arbitrary nor capricious NYPA's decision to defer payment of the Restitution Benefit until the last quarter of 2007, reasoning that the agency had discretion to determine the timing of payments since the legislation did not contain a payment

schedule.[1] This Court granted NYPA leave to appeal (11 NY3d 712 [2008]) and we now affirm.

## NYPA's Election of Benefits Determination

Both parties agree that the dispute concerning whether manufacturers could receive both restitution and rebate benefits or had to choose between the two turns on language that was added to Economic Development Law § 189 (a) (5) in 2006. NYPA does not contend that its interpretation of the statute is entitled to deference, nor is this the type of case where deference to an administrative agency would be appropriate as it does not involve "specialized knowledge and understanding of underlying operational practice or entail[ ] an evaluation of factual data and inferences to be drawn therefrom" (see *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303, 312 [2005] [internal quotation marks and citations omitted]). When interpreting a statute, "[i]t is fundamental that a court . . . should attempt to effectuate the intent of the Legislature. The starting point is always to look to the language itself and where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning" (*Pultz v Economakis*, 10 NY3d 542, 547 [2008], quoting *State of New York v Patricia II.*, 6 NY3d 160, 162 [2006]).

Turning to the statutory scheme, since 2004 the Rebate Program has been addressed in the first paragraph of Economic Development Law § 189 (a) (5). The 2006 amendment added the following paragraph to that section:

> "Provided further that, notwithstanding any provision of law to the contrary, for the period beginning [January 1, 2006], for recipients who choose to elect a contract extension, and whose unit cost of electricity under such contract extension exceeds the unit cost of electricity of the [local electricity provider], the power authority shall reimburse the recipient for all dollars paid in excess of the unit cost of electricity of the [local electricity provider]. *In addition, a recipient that is a manufacturer that elected a contract extension, may choose to withdraw such election and instead may choose to elect an electricity savings reimbursement upon notice to the power*

---

1. Petitioners have not cross-appealed and have abandoned any claim relating to the timing of restitution payments.

*authority*. Such electricity savings reimbursement shall be calculated according to the formula for the basic reimbursement as explained in this paragraph" (L 2006, ch 645, § 3 [emphasis added]).

The first sentence created a new Restitution Benefit that allowed PFJ contract participants to recoup from NYPA overpayments they made under their contracts retroactive to the beginning of January 2006. The second sentence provided a special advantage to PFJ participants engaged in manufacturing, permitting them to withdraw from their contracts and join the Rebate Program during the contract term, meaning they were not locked into contract extensions. And the third sentence clarified that rebates would continue to be calculated under the formula that was added to the statute in 2004 when the Rebate Program was first created.

■ Based on the language and organization of this provision, we see no evidence that the Legislature contemplated that manufacturers would be required to choose between the two programs—to either select the Restitution Benefit or opt out of their contracts and participate in the Rebate Program. The language of the amendment contains no terminology suggesting that such an election must be made. The second sentence— allowing manufacturers that have extended their contracts to withdraw the extensions and join the Rebate Program—begins with the words "in addition." This is hardly the language we would expect to see if the Legislature intended that manufacturers must make a choice between the benefit granted in the first sentence and the benefit defined in the second. If such an election of benefits had been the objective, the second sentence would have included a clause conditioning the "opt out" benefit; for example, it might have read "in lieu of being reimbursed for overpayments" manufacturers may join the Rebate Program or "manufacturers may opt instead" to withdraw from their contracts and participate in the Rebate Program. NYPA asserts that the phrase "in addition" is merely a transition and was not meant to have any substantive effect. But even if we credited this argument—and we generally do not presume that words chosen by the Legislature have no meaning—it does not support NYPA's election of benefits determination because, when the "in addition" clause is omitted, what remains is a paragraph that defines two benefits potentially available to manufacturers without indicating that they are mutually exclusive.

NYPA suggests that a single manufacturer cannot qualify for both benefits because the Restitution Benefit applies to those

with contracts and the Rebate Program applies only to those who have opted out or not renewed their contracts. But when the Legislature adopted the amendments in August 2006, it made the Restitution Benefit retroactive to January 1, 2006. At the time the statute became law, some manufacturers (like petitioners) had been paying higher energy costs under their PFJ contracts than they would have paid had they bought electricity directly from local power companies. Hence, they were already entitled to up to eight months of restitution for overpayments they had made under their contracts (by the time NYPA implemented the statute three months later, the value of the Restitution Benefit was potentially even greater). Manufacturers in this position could conceivably receive a Restitution Benefit and then withdraw their contract extensions (or decline to renew their contracts at the end of December 2006) to join the Rebate Program. Under NYPA's analysis, these manufacturers would have to waive their right to a Restitution Benefit already earned in order to take advantage of the opt out clause in the second sentence. We do not believe this result is required by the language in the statute.

Nor is NYPA's view consistent with the legislative history of the 2006 amendments. Though not conclusive, that history tends to support the petitioners' reading of the statute. The Senate sponsor explained that the legislation would "provide reimbursements for Power for Jobs customers who paid higher than market price rates this last winter" and "would *also* allow manufacturers that are contract customers to switch to the rebate program" (Letter of Senator Wright, Bill Jacket, L 2006, ch 645, at 4 [emphasis added]). Then-Assemblymember Paul Tonko, the Assembly sponsor, noted that the legislation:

> "Requires the Power Authority of the State of New York (PASNY) to allow PFJ manufacturers paying higher than market prices under their PFJ contract extensions to switch to a rebate form of the program, which would hold them harmless against rate fluctuations and would provide a discounted rate; *and,*

> "Requires PASNY to make up the difference between the rates the businesses would have paid for energy to their local utility as compared to the higher price PASNY charged them under their contract extensions, retroactive to January 1, 2006"

(Assembly Sponsor's Mem in Support, Bill Jacket, L 2006, ch 645, at 5 [emphasis added]).

The phrase "the businesses" in the second sentence refers back to the "PFJ manufacturers" cited in the first sentence—those that had paid higher-than-market energy prices during the winter of 2006 under their PFJ contracts. The Assembly sponsor's observations make no sense if, as NYPA claims, the legislative objective had been to have these manufacturers choose between recouping their overpayments and prospectively joining the Rebate Program. The Division of the Budget similarly concluded that "NYPA must allow customers to maximize benefits by switching from the contract extension to the rebate program *and* retroactively reimburse customers that paid rates above the market price" (Budget Report on Bills, Bill Jacket, L 2006, ch 645, at 10 [emphasis added]). In fact, the increased costs associated with these dual requirements led the Division to recommend that the Governor veto the amendments (*id*. at 10-11).

The Bill Jacket thus indicates that the Legislature intended that benefits to PFJ participants—particularly manufacturers—be extended and expanded, rather than interrupted. Since the Restitution Benefit was created to provide a remedy to businesses that paid higher prices under their PFJ contracts than they would have paid if they purchased power from local providers, there is no reason to impose a strained interpretation of the clause to require that these same participants forgo recoupment of those overpayments in order to receive a future benefit. Nor is it necessary to adopt NYPA's view of the statute in order to avoid "double dipping" by manufacturers since the Rebate Program grants prospective relief while the Restitution Benefit covers overpayments already made. We therefore agree with the Appellate Division that NYPA's determination was erroneous insofar as it required petitioners to choose between the Restitution Benefit and the Rebate Program.

## NYPA's Rebate Calculation Determination

The Rebate Program allows participants that had PFJ contracts to decline to renew those contracts and instead purchase power directly from local providers. If participants have to pay more for the power they buy from local providers than they would have paid under the NYPA contract, NYPA is obligated to give the participant a "power for jobs electricity savings reimbursement" or rebate. The rebate is the difference

between the unit cost of electricity the participant paid the provider (on average, each quarter) and the price the participant paid under the PFJ contract during a particular time frame. In this case, the parties disagree on the time frame that NYPA must use as the baseline for comparison when calculating whether a rebate is warranted and, if so, the amount of the rebate.

The Rebate Program was established in 2004 when the first paragraph of Economic Development Law § 189 (a) (5) was enacted (*see* L 2004, ch 59, part T, § 3). The 2006 amendments gave manufacturers that had already extended their contracts the option of withdrawing their renewals and choosing instead to participate in the Rebate Program. But it did not change how rebates are calculated, stating: "Such electricity savings reimbursement shall be calculated according to the formula for the basic reimbursement as explained in this paragraph" (L 2006, ch 645, § 3). Thus, the amendment referred back to the formula developed in the 2004 legislation, which requires that the price the participant paid to a local provider be compared against "the average unit cost of electricity such recipient paid during the final year of the contract for power allocated under phase four or five of the power for jobs program" (*see* Economic Development Law § 189 [a] [5]).

In interpreting this provision as establishing that baseline contract costs would be the price participants paid NYPA in 2006, NYPA focused on the phrase "during the final year of the contract," noting that those who opted out of their contracts as a result of the 2006 amendments would be doing so at the end of 2006 (meaning the final year of the contract would be 2006). Objecting to this view, petitioners contended that this phrase be read in conjunction with the language that follows it, meaning that the baseline is "the average unit cost of electricity . . . paid during the final year of the contract . . . *under phase four or five of the power for jobs program*" (emphasis added). They emphasized that the Legislature did not refer only to the last year a participant had a contract with NYPA, but instead specifically tied the rebate to prices paid in the last year of phase four or five of the PFJ program.

■ Although the legislation is certainly not a model of clarity, we agree with the Appellate Division that the statutory directive that rebates be calculated based on the final year of PFJ phase four or five precludes NYPA's reliance on 2006 contract prices. The initial three years of the PFJ program were referred

to as phases one, two and three (*see* Economic Development Law § 189 [e] [1]). When it continued the PFJ program in 2000 and again in 2002, the Legislature characterized the contract extensions as phases four (*see* Economic Development Law § 189 [e] [2], as added by L 2000, ch 63, part KK, § 4) and five (*see* Economic Development Law § 189 [e] [3], as added by L 2002, ch 226, § 5), respectively. But when the Legislature extended and amended the program after 2002, it did not denominate new "phases." Thus, the last phases identified in the statutory scheme are phases four and five, which have the same sunset date—December 31, 2005.[2] Since the rebate calculation provision states that the baseline contract costs will be those "paid during the final year of the contract . . . under phase four or five of the power for jobs program," and phases four and five terminated at the end of 2005, the baseline year for purposes of calculation of the rebate is, at the latest, 2005. It follows that NYPA was required to compare the costs paid by Rebate Program participants that purchased from local providers against the costs those participants had paid in the last year of their contracts under phases four and five, which for most participants—including petitioners—was 2005.[3]

Not only is this interpretation consistent with the plain designation chosen by the Legislature but it also comports with the history of the 2006 amendments. Since that legislation was motivated, in part, by a desire to ameliorate the high prices NYPA had charged under the contracts in the winter of 2006, it is no surprise that the Legislature sought to ensure that the more reasonable prices paid the year before would be the

**2.** The phases are defined in Economic Development Law § 189 (e). Section 189 (e) (2) states: "phase four shall begin no sooner than [January 1, 2001] and shall end on or before [December 31, 2005]" and section 189 (e) (3) directs: "phase five shall begin no sooner than [January 1, 2002] and shall end on or before [December 31, 2005]."

**3.** NYPA indicates that it has always used the rates paid in the final year of a PFJ contract when calculating rebates. But this practice extends back only to 2004 since that was the year the Rebate Program was created. For participants that joined the program in 2004 and 2005, NYPA's use of the prices from the last year of the contracts—prices from 2003, 2004 and portions of 2005—was consistent with the phase four and five terminology in the statute since those phases did not terminate until the end of 2005. It was not until it issued its November 2006 determination stating that rebates would be calculated based on 2006 prices that NYPA ran afoul of the statutory directive. Petitioners, along with other similarly-situated PFJ participants, immediately objected to NYPA's interpretation and this litigation ensued within four months. Hence, this is not a case where an agency's long-standing and broadly-accepted interpretation of a statute is being disturbed.

baseline for calculating rebates. This was a complement to the flexibility the legislation gave manufacturers in determining whether to continue to purchase power from NYPA under PFJ contracts or to join the Rebate Program.

NYPA contends that this is a "strange reading" of the language and asserts that the statutory reference to phases four and five made sense in 2004 when the Rebate Program was initially introduced because the Legislature believed that the PFJ program would cease at the conclusion of phase five. NYPA therefore believes that the Legislature "overlooked" or forgot to delete the reference to phases four and five in the first paragraph of section 189 (a) (5) when it extended the Rebate Program in 2006. Essentially, NYPA asks us either to ignore the "phase four or five" language or to consider the subsequent contract extensions as the equivalent of phase extensions, even though the Legislature did not characterize them in this fashion (as it had in previous amendments).

We cannot rule out the possibility that the Legislature's failure to delete the references to phases four and five from the first paragraph of Economic Development Law § 189 (a) (5) was merely an oversight—but there is no indication in the Bill Jacket that the Legislature intended the baseline year for purposes of the rebate calculation to be 2006. Rather, there is a sound basis to draw the contrary conclusion. Whatever the intended purpose, the fact remains that the Legislature did not alter the rebate calculation methodology when it adopted the 2006 amendments—to the contrary, it added language expressly providing that rebates would be calculated pursuant to the preexisting formula. As a result, petitioners were entitled to have rebates calculated based on the rates charged under phases four and five of the program as directed in Economic Development Law § 189 (a) (5).

Because NYPA erred when it required these manufacturers to choose between the Restitution Benefit and the Rebate Program and announced that their rebates would be calculated based on 2006 PFJ contract prices, those aspects of its determination were properly annulled.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

READ, J. (dissenting in part). When the Legislature continued the Power for Jobs (PFJ) program in 2004, it created the new rebate benefit described in the majority opinion. Eligible

participants were given a choice to extend their power contracts with the New York Power Authority (NYPA) or, alternatively, to opt out of the PFJ program and receive the rebate, calculated in accordance with a formula in the statute (*see* Economic Development Law § 189 [a] [5], as added by L 2004, ch 59, part T, § 3). When the Legislature again extended the PFJ program in 2005, eligible participants were afforded the same choice (*see id.*, as amended by L 2005, ch 59, part P, § 2).

In 2006, the Legislature continued the PFJ program for another six months and created one option for all PFJ customers and a second option only available to manufacturers; specifically, (1) customers electing a contract extension became eligible to receive a newly created restitution benefit described in the majority opinion; and (2) manufacturers could cancel their contracts and receive the same type of rebate benefit made available by the 2004 and 2005 amendments (*see id.*, as amended by L 2006, ch 645, § 3 [hereafter 2006 amendments or the statute]). The Legislature did not amend the formula for calculating the rebate.

The majority concludes that PFJ customers that are manufacturers, like petitioners, qualify under the 2006 amendments for both the restitution and the rebate benefits; and that the baseline for calculating rebates is, at the latest, 2005. Although I agree with the majority that petitioners were not required to elect between the restitution and rebate benefits, I conclude that the baseline for calculating the rebate is the year preceding contract cancellation.

The formula for calculating the rebate measures the former PFJ customer's power costs against "the average unit cost of electricity [it] paid during the final year of the contract for power allocated under phase four or five of the power for jobs program" (Economic Development Law § 189 [a] [5]). Economic Development Law § 189 (e) (2) and (3) state—and the majority emphasizes—that delivery of power under phases four and five ends "on or before December thirty-first, two thousand five." Critically, however, other sections of the statute—which the majority does not mention—demonstrate that the Legislature, in fact, extended delivery of "power allocated under phase four or five" beyond that date. For example, the 2006 amendments provided that "the term of contracts for *allocations under the fifth phase* of the program shall in no case extend *beyond June thirtieth, two thousand seven*" (Economic Development Law § 189 [f], as amended by L 2006, ch 645, § 4 [emphasis added]).

Thus, if a manufacturer withdraws its contract extension in order to take advantage of the rebate, "the final year of the contract for power allocated under phase four or five" is the year preceding contract cancellation.

This interpretation is consistent with the purpose of the rebate, and the way in which NYPA has administered it since 2004. The rebate was intended to guarantee that NYPA's former PFJ customers would not pay more for electricity than they spent in their last year in the program. And, of course, a former customer might pay less if able to secure a better price in the open market from a non-NYPA energy supplier. The rebate option thus afforded former PFJ customers a stable, predictable (maximum) price.

Concluding that "the baseline year for purposes of calculation of the rebate is, at the latest, 2005," the majority states that this is "no surprise" because the 2006 amendments were "motivated, in part, by a desire to ameliorate the high prices NYPA had charged under the contracts in the winter of 2006" (majority op at 234). This conclusion is contrary to the statutory language, as noted above. Moreover, the record demonstrates only that *some* PFJ participants were paying more than they would have paid their local utilities in the unusually warm winter of 2006 (Letter of Senator Wright, Bill Jacket, L 2006, ch 645, at 4).

Chief Judge LIPPMAN and Judges CIPARICK, PIGOTT and JONES concur with Judge GRAFFEO; Judge READ dissents in part in a separate opinion in which Judge SMITH concurs.

Order, insofar as appealed from, affirmed, with costs.