[926 NYS2d 686]

In the Matter of ITHACA CITY SCHOOL DISTRICT, Respondent, v NEW YORK STATE DIVISION OF HUMAN RIGHTS et al., Appellants.

Third Department, June 30, 2011

**APPEARANCES OF COUNSEL**

*Caroline J. Downey, New York State Division of Human Rights*, New York City (*Michael K. Swirsky* of counsel), for New York State Division of Human Rights, appellant.

*Schlather, Stumbar, Parks & Salk*, Ithaca (*Raymond M. Schlather* of counsel), for Amelia Kearney and another, appellants.

*Bond, Schoeneck & King*, Syracuse (*Jonathan B. Fellows* of counsel), for respondent.

*Eric T. Schneiderman, Attorney General*, New York City (*Cecelia C. Chang* of counsel), amicus curiae.

*Lambda Legal Defense and Education Fund, Inc.*, New York City (*Thomas W. Ude Jr.* of counsel), for Advocates for Children of New York and others, amici curiae.

## OPINION OF THE COURT

Stein, J.

At all times relevant to this proceeding, respondent Amelia Kearney (hereinafter respondent) and her daughter (born in 1993), both African American, lived in the City of Ithaca, Tompkins County. In 2006, respondent filed a complaint against petitioner with respondent State Division of Human Rights (hereinafter SDHR), alleging that her daughter, while a student at one of petitioner's middle schools, was repeatedly subjected to racial insults, racially-based threats and physical harm "by a

group of [Caucasian] boys who call themselves 'Red Necks.' "
The alleged incidents, most of which occurred on the school bus
that transported the children home at the end of the day, took
place at various times from mid-September 2005 until mid-
December 2005, as well as in February 2006, when one of the
boys on the bus held up a racially offensive sign. According to
respondent, she repeatedly contacted school officials to complain
about the abuse and request help for her daughter, however,
petitioner failed to meaningfully respond to the incidents,
thereby permitting the harassment to persist.

SDHR investigated the complaint and referred the case to a
public hearing,[1] after which an Administrative Law Judge (here-
inafter ALJ) found that the student misconduct alleged by re-
spondent was either conceded by petitioner or otherwise proven.
The ALJ further found that petitioner's response was deficient,
inconsistent and incompetent and, consequently, that petitioner
had permitted the repeated racial harassment of respondent's
daughter in violation of the Human Rights Law. The ALJ recom-
mended that petitioner pay respondent and her daughter
$500,000 each, and also make a number of immediate changes
in administrative practices and training procedures to amelio-
rate the situation and prevent future violations. Thereafter, the
Commissioner of Human Rights reduced the award to respon-
dent and her daughter to $200,000 each, but otherwise adopted
the ALJ's recommendations.

Subsequently, petitioner commenced this proceeding pursuant
to Executive Law § 298, challenging SDHR's jurisdiction over it,
as a public school district, as well as the monetary awards and
injunctive relief. Supreme Court determined that SDHR lacked
jurisdiction over petitioner, prompting SDHR and respondent to
appeal.[2]

---

1. Petitioner's CPLR article 78 challenge to SDHR's authority to do so was
unsuccessful. Although respondents argue that petitioner waived any objec-
tion to jurisdiction because of certain actions taken by petitioner prior to the
completion of the public hearing, we note that this Court previously held in
*Matter of Newfield Cent. School Dist. v New York State Div. of Human Rights*
(66 AD3d 1314, 1316 [2009]) that a challenge to the applicability of Executive
Law § 296 (4) to public school discrimination is appropriate after a final deter-
mination by SDHR.

2. We note that Supreme Court erred in failing to transfer this proceeding
challenging an order rendered after a public hearing to this Court. Unlike
CPLR 7804 (g), Executive Law § 298 requires immediate transfer to this
Court without consideration of any threshold issues (*see* 22 NYCRR 202.57
[c]; *State Div. of Human Rights v YMCA of Greater N.Y.*, 139 AD2d 440, 441

SDHR has "general jurisdiction and power" to, among other things "eliminate and prevent discrimination . . . in educational institutions" (Executive Law § 290 [3]) and we are unpersuaded that anything in the statutory language of the Human Rights Law, or its legislative history, dictates the exclusion of public schools from that broad mandate. As relevant here, Executive Law § 296 (4) sets forth certain substantive provisions of the Human Rights Law that SDHR may enforce pursuant to its general jurisdiction. Specifically, that statute makes it:

> "an unlawful discriminatory practice for an education corporation or association which holds itself out to the public to be non-sectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law to . . . permit the harassment of any student or applicant, by reason of his [or her] race" (Executive Law § 296 [4]).

Petitioner contends that it is not subject to a claim of discrimination commenced against it pursuant to that provision on the sole ground that it is not an "education corporation or association."

What constitutes an "education corporation or association" is not defined in the Human Rights Law. Accordingly, relying on the determination of the Appellate Division, Second Department in *Matter of East Meadow Union Free School Dist. v New York State Div. of Human Rights* (65 AD3d 1342 [2009], *lv denied* 14 NY3d 710 [2010]), petitioner urges this Court to look to the General Construction Law to supply the necessary definitions. Petitioner argues that a strict reading of General Construction Law §§ 65 and 66 leads to the conclusion reached by the Second Department that a public school district is not an "education corporation or association" for purposes of the Human Rights Law and is, therefore, immune from claims pursuant to Executive Law § 296 (4).

■ We disagree. Even assuming, arguendo, that the tortured legislative history underlying General Construction Law §§ 65 and 66—as well as various other statutes—supports petitioner's argument that the definition of "education corporation" therein does not embrace public school districts, the fact remains that this does not, as petitioner contends, necessarily mean that this definition is applicable to Executive Law § 296 (4). The approach

[1988], *lv denied* 72 NY2d 807 [1988]). Therefore, we deem it appropriate to vacate the order appealed from and review the matter de novo (*see State Div. of Human Rights v YMCA of Greater N.Y.*, 139 AD2d at 441).

advocated by petitioner completely ignores General Construction Law § 110, which provides that the General Construction Law is not intended to supply a missing definition in a particular statute when the "general object, or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended from that required to be given by [the General Construction Law]." In that regard we note that, as a remedial statute, the Human Rights Law must be liberally construed to accomplish its beneficial purposes—one of which is to eliminate discrimination in "educational institutions" (Executive Law §§ 290, 300)—"and to spread its beneficial results as widely as possible" (*Matter of Rizzo v New York State Div. of Hous. & Community Renewal*, 6 NY3d 104, 114 [2005]; *see Matter of Crucible Materials Corp. v New York Power Auth.*, 50 AD3d 1353, 1355-1356 [2008], *affd* 13 NY3d 223 [2009]).

To adopt petitioner's premise that the General Construction Law definition of "educational corporation" should be applied to Executive Law § 296 (4), and that the term "education association" should likewise be strictly construed, would be to accept that, in enacting the Human Rights Law, the Legislature intended to provide its protection against discrimination only to the relatively minuscule percentage of students whose families can afford to send them to private, nonreligious schools, relegating public school students to other more onerous and/or less comprehensive remedies. In our view, such a result is so clearly contrary to the express purpose of the Human Rights Law that resort to the General Construction Law is inappropriate and unreasonable. Thus, we conclude that public school districts are among the "educational institutions" over which SDHR has jurisdiction and that Executive Law § 296 (4) is the statutory mechanism by which it can seek to eliminate any discrimination by such school districts.[3]

In light of our conclusion that petitioner is an entity subject to Executive Law § 296 (4), we next consider whether SDHR's findings are supported by substantial evidence. As relevant herein, a violation of Executive Law § 296 (4) occurs when

---

3. In our view, the dissent's reliance on the definition of "educational institution" set forth in Education Law § 313 is misplaced. That statute clearly applies to unfair admissions and course enrollment practices as they relate to postsecondary schools. Since such practices would generally be irrelevant to public primary and secondary schools, the purpose and ambit of Education Law § 313 render its provisions entirely inapposite to those of Executive Law § 296 (4).

a school district such as petitioner "permit[s] the harassment of any student or applicant[ ] by reason of his [or her] race" (Executive Law § 296 [4]). Upon our review, we conclude that SDHR's determination that petitioner—which does not dispute that the majority of the alleged incidents occurred—permitted students to engage in a course of racially-motivated harassment of respondent's daughter is supported by substantial evidence.

Specifically, the Commissioner confirmed the ALJ's finding that petitioner "repeatedly chose a course of action which both put the interests of the white male perpetrators ahead of the interests of the black female student, and was repeatedly shown to be, and acknowledged to be, ineffective in stopping the discriminatory conduct." Ample testimony and other evidence, including a videotape of one of these incidents, supported respondent's allegations that her daughter was subjected to verbal and physical abuse on the bus, including being spat upon, which was reported to the school. Nevertheless, petitioner's middle school administrators routinely imposed only two to three-day suspensions on the offending students in response and testified that they felt it was "unfair" to move a problem student to another school to address that student's conduct. The assistant principal conceded that there was a "racial tidal wave" that year, the school bus that respondent's daughter took home was a "hell hole" and he knew that she had been threatened with gun violence. However, he did not require the offenders to submit to more serious superintendent's hearings, he did not impose lengthier suspensions and he did not even exercise his unilateral power to ban the offenders from riding on that particular bus.[4] Thus, according due deference to SDHR's expertise in evaluating discrimination claims (*see Matter of Price v Southwest Airlines, Inc.*, 66 AD3d 1267, 1268 [2009], *lv dismissed* 14 NY3d 858 [2010]; *Matter of Matteo v New York State Div. of Human Rights*, 306 AD2d 484, 485 [2003]), we conclude that the finding of discrimination with respect to respondent's daughter was supported by substantial evidence (*see Matter of Anagnostakos v New York State Div. of Human Rights*, 46 AD3d 992, 993 [2007]).

■ Turning next to the compensatory damage awards for the discriminatory conduct, we first address whether the award of $200,000 to respondent's daughter is appropriate. The mental

---

4. Ironically, respondent's daughter testified that, at one point, it was she who was told to "find another way home" by the bus driver after an incident during which she yelled back at her tormenters.

and emotional pain and suffering endured by this child as a result of the discrimination is more than amply demonstrated in this record. The proof established that she suffered significant mental anguish as a result of the racism that petitioner allowed to persist at her school and on her bus, which impacted negatively upon her grades, her sense of identity and her belief in her own physical well-being.[5] Respondent sought counseling and other professional mental health services for her daughter to address the severe impact of these experiences. Under the circumstances, we find that the $200,000 award to respondent's daughter is supported by the evidence and effectuates the purposes of the Human Rights Law (*see* Executive Law § 297 [4] [c]).

■ With respect to the propriety of the separate $200,000 award to respondent, we note first our disagreement with petitioner's contention that respondent is not entitled to an independent award because she initiated the discrimination claim on behalf of her daughter as victim. Executive Law § 297 (9) provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages." Here, an examination of the pleadings and proof reveals sufficient independent proof that respondent was aggrieved because of petitioner's conduct so as to justify an award of damages. For example, respondent testified as to her own hurt and anger when she learned of the racial discrimination her daughter was experiencing. Respondent relayed that she had experienced similar discrimination and abuse growing up and this motivated her to attempt to prevent her daughter from being traumatized by it as well. She described how "these things stay with you for the remainder of your life . . . this never goes away." Respondent's detailed description of her largely unsuccessful and frustrating attempts to have petitioner's employees respond to her requests for help for her daughter were, as aptly described by the ALJ, a "parent's nightmare." Accordingly, we find sufficient evidence to support a separate award to respondent. Nevertheless, given the comparatively sparse proof of emotional distress in contrast to the evidence of damages experienced by her daughter, we deem it appropriate to reduce the award of damages to respon-

---

5. Respondent's daughter testified, among other things, that the taunting caused her to feel "worthless" and ashamed of her race. Also, her fear over the threats of gun violence against her prompted her to sleep on the floor away from the windows.

dent to $50,000 (*see Matter of New York State Dept. of Correctional Servs. v New York State Div. of Human Rights*, 225 AD2d 856, 858-859 [1996]; *Matter of New York State Dept. of Correctional Servs. v State Div. of Human Rights*, 207 AD2d 585, 585-586 [1994]).

■ We also conclude that the injunctive relief ordered by SDHR was appropriate. SDHR issued an order requiring petitioner to provide antidiscrimination training to its staff, develop a new student disciplinary code to avoid recurrences of discrimination and develop a "community base[d] program to address the racial tensions in its schools." Such relief was within SDHR's broad authority to require the adoption of appropriate measures to redress injuries and to order offenders to cease discriminatory practices (*see* Executive Law § 297 [4] [c]; *Matter of Freudenthal v County of Nassau*, 99 NY2d 285, 291 [2003]; *see also* Executive Law § 290). Inasmuch as the injunctive relief was suitably tailored to the systemic nature of the problem and the circumstances existing in the schools which permitted the discrimination to recur, we find no basis to disturb it.

Petitioner's remaining contentions have been examined and found to be unpersuasive.

Rose, J. (dissenting). While I am in complete agreement with the majority in all other respects, I disagree that a public school district is an "education corporation" subject to Executive Law § 296 (4). Instead, a school district enjoys a unique status as a "municipal corporation" (*see* General Construction Law § 66 [2]), and the classification of corporations found in the General Construction Law persuades me that the Legislature did not intend Executive Law § 296 (4) to apply to school districts (*see* General Construction Law § 65 [a] [1]; [b] [1]; [c] [2]; § 66 [6]). As noted by the Second Department, these statutory classifications of "municipal corporation" and "education corporation" are mutually exclusive, and school districts are not subject to Executive Law § 296 (4) (*see Matter of East Meadow Union Free School Dist. v New York State Div. of Human Rights*, 65 AD3d 1342, 1343 [2009], *lv denied* 14 NY3d 710 [2010]).*

In declining to apply the General Construction Law to Execu-

---

* This ruling by the Second Department, which the Court of Appeals has declined to review, has resulted in a troubling disparity in the application of the statute. In its brief, respondent State Division of Human Rights advises that it no longer applies the statute within the Second Department while continuing to process complaints against public school districts in the other Departments, resulting in an unequal application of the law.

tive Law § 296 (4), the majority relies upon the general purpose of the Human Rights Law to eliminate discrimination in "educational institutions" pursuant to Executive Law § 290, together with General Construction Law § 110, which provides that "[t]his chapter is applicable to every statute unless its general object, or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended." While I certainly agree that the Human Rights Law is to be construed liberally (*see* Executive Law § 300), "even a remedial statute must be given a meaning consistent with the words chosen by the Legislature" (*Enright v Eli Lilly & Co.*, 77 NY2d 377, 385 n 1 [1991], *cert denied* 502 US 868 [1991]).

There is nothing within the general object or the language of Executive Law § 296 (4) to suggest that school districts were intended to be included within the phrase "an education corporation or association which holds itself out to the public to be non-sectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law." To the contrary, the restrictive clause introduced by the relative pronoun "which" indicates that school districts are not included as, instead of holding themselves out to the public to be nonsectarian (implying that they have a choice), they are constitutionally required to be nonsectarian (*see* NY Const, art XI, § 3). Further, there is nothing within Executive Law § 296, or elsewhere in the Human Rights Law, that defines the term "educational institution" as used in Executive Law § 290 or suggests that it is meant to include school districts. Rather, the term is defined in the Education Law as "any . . . institution of *post*-secondary grade subject to the visitation, examination or inspection by the state board of regents or the state commissioner of education and any business or trade school in the state" (Education Law § 313 [2] [a] [emphasis added]). Had the Legislature intended to include school districts within the provisions of Executive Law § 296 (4), it certainly knew how to do so (*see e.g.* Executive Law § 296 [15], [16]). In the absence of anything to preclude application of the General Construction Law, I would, upon our de novo review, grant the petition, annul the determination and dismiss the administrative complaint.

PETERS, J.P., SPAIN and EGAN JR., JJ., concur with STEIN, J.; ROSE, J., dissents in a separate opinion.

Ordered that the order is vacated, on the law, without costs; petition reinstated, matter deemed transferred to this Court for

de novo review, and, upon said review, determination modified, by reducing the amount awarded for compensatory damages to respondent Amelia Kearney from $200,000 to $50,000; and, as so modified, confirmed.