OPINION OF THE COURT
Debra Silber, J.
The decision/order on this motion is as follows:
Defendants Phoenix House and Sydney Hargrove bring this pre-answer motion to dismiss plaintiff Wilson’s action against them. Plaintiff opposes the motion.
For the reasons set forth herein, the defendants’ motion is granted in part and denied in part.
Defendants aver that pursuant to CPLR 3211 (a) (7), dismissal of plaintiffs complaint is warranted as plaintiff fails to state any legally cognizable cause of action. Defendants also move, pursuant to CPLR 3211 (a) (3), to dismiss plaintiff Wilson’s claim for injunctive relief on the grounds that the plaintiff lacks standing to sue for such relief. Finally, defendants move on the basis of decisional law to dismiss plaintiff Wilson’s claim for punitive damages, on the basis that plaintiff fails to allege facts sufficient for such a claim.
*680 Background
The following facts are taken almost verbatim from the plaintiffs November 15, 2011 complaint, and are assumed to be true for the purposes of this motion.
On March 27, 2008, plaintiff Sabrina (Sabire) Wilson — a 32-year-old, homeless transgender (male-to-female) woman, diagnosed with gender identity disorder (GID) at 16 — was arrested for a drug offense. It was her first arrest for a felony. In August of 2008, she entered into a plea agreement which provided that she would participate in a residential drug treatment program as an alternative to prison. On December 23, 2008, plaintiff entered into the residential drug treatment program at Phoenix House in Brooklyn, New York. It is unclear why there was such a long gap in time, and the court assumes, but does not know, that it was caused by a waiting list for a place in the program.
During the initial admission interview at Phoenix House, plaintiff Wilson disclosed her transgender identity. The admissions’ counselor explained to plaintiff that, because she was biologically male, she was required to use the men’s bathroom facilities and share a room with men. Plaintiff did not object to this during her initial interview as she “sens[ed] she had no choice” but to comply with this requirement. Prior to plaintiffs arrival, the staff at the facility was thus informed of plaintiffs transgender status.
The day after plaintiff was admitted, on Christmas Eve, defendant Sydney Hargrove, the director of the induction unit, called plaintiff into his office. During this meeting Hargrove asked plaintiff whether her hair was “real” and, upon learning plaintiff wore a wig, told plaintiff she was not allowed to wear a wig at Phoenix House. It is unclear from the plaintiff’s complaint whether any explanation was offered to her as to why she could not wear a wig, although the complaint notes that some female participants in the program did wear wigs. Approximately one month later, the senior counselor at the induction unit informed the plaintiff she was no longer allowed to wear high heeled shoes; the plaintiff’s complaint notes that some female participants in the program sometimes wore high heels. According to the plaintiffs complaint, the counselor said Hargrove expressed concern that the plaintiff might fall and hurt herself. Aside from the prohibition of wigs and heels, the complaint does not allege that defendants required any other changes to plaintiff’s wardrobe or appearance. Plaintiff made *681 excellent progress, and she was asked to serve as a “Resident Structure Senior Coordinator” after a few weeks.
Plaintiff was required to attend meetings and support groups as a condition of her residential inpatient treatment at Phoenix House. During such meetings, it was typical for women to sit on one side of the room and men on the other. An individual running one of these groups informed plaintiff that defendant Hargrove “want[ed] her to sit on [the male] side [of the class].” Defendant Hargrove himself at one point instructed plaintiff to sit with the men during these meetings.
In early January 2009, a senior counselor permitted plaintiff to participate in a new gender-specific women’s support group. Some female group members expressed discomfort at plaintiff Wilson’s presence and Wilson was asked to leave. Plaintiff met with defendant Hargrove to request readmission to this group, but Hargrove denied her request, and said plaintiff never should have been given permission to participate in the women’s group in the first place. At this time, plaintiff lodged a complaint with Hargrove that she should not be required to share sleeping or bathroom accommodations with men. Defendant Hargrove did not make any changes to plaintiff’s sleeping or bathroom arrangements, and told her “you should adjust.” After her meeting with Hargrove, plaintiff appealed personally to the members of the women’s group and secured their consent for her to attend the women’s group sessions. Nevertheless, defendant Hargrove maintained that plaintiff could not attend the women’s support group, despite the consent of the other members.
During her fourth week in the program, plaintiff was informed by another counselor that defendant Hargrove believed that Wilson should be transferred to a different residential treatment program because he believed that her needs could not he met at Phoenix House due to her transgender status. The counselor told her that if a suitable program could not be located she would most likely be sent to jail. Some of the other residents, upon learning of her impending transfer, drew up a petition recommending that defendant Hargrove reconsider his decision. Thirty-eight residents signed the petition. Plaintiff also wrote a letter to defendant Hargrove “pleading” that she be allowed to stay at Phoenix House. Plaintiff received no response to this letter, nor was there any response to the petition submitted by the residents. Defendant Hargrove did not identify a treatment program that was part of the court’s alternative to incarceration program which plaintiff could transfer to.
*682 At this point, plaintiff had noticed she had not advanced to the next step with the rest of her treatment group and new residents had arrived. Plaintiff requested another meeting with Hargrove. It was at this time that Hargrove confirmed his decision to transfer plaintiff from Phoenix House, stating, “[w]e can’t suit your needs as a transgender in our program.” Despite plaintiff’s inquiries and requests, an alternative treatment program that could “meet her needs” was not located by Phoenix House, and plaintiff, angry and frustrated that they would not let her complete the treatment program, left Phoenix House without permission. She was ultimately resentenced to 2V2 years in prison.
Procedural History
On September 2, 2010, plaintiff filed a lawsuit pro se in the United States District Court, Southern District of New York (docket No. 10 Civ 7364) against Phoenix House and Hargrove. Therein, plaintiff brought a claim for injunctive relief and compensatory damages under 42 USC § 1983, asserting that the defendants discriminated against her on the basis of sex or sexual orientation in violation of the Equal Protection Clause. Plaintiff also brought a false advertising claim against Phoenix House under section 43 (a) of the Lanham Act (15 USC § 1125 [a] [1] [B]), based on representations on its website that it accepted lesbian and gay patients. Finally, plaintiff brought a state law claim alleging that defendants violated section 296 of the Executive Law, which is the New York State Human Rights Law (NYSHRL), when they discriminated against her by engaging in housing discrimination based upon her disability and failed to make reasonable accommodations for her disability, which is known as gender identity disorder.
Defendants filed a motion to dismiss plaintiff’s federal complaint on the grounds that (1) plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA); and (2) she failed to state a claim upon which relief could be granted pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure. By order of Judge Denise Cote, the plaintiff’s claim for compensatory damages under section 1983 was dismissed, as was her claim under section 43 (a) of the Lanham Act. Plaintiffs claim for injunctive relief pursuant to section 1983 and her NYSHRL claim survived. Judge Cote’s unpublished opinion and order, dated August 1, 2011, clarified, as discussed further herein, that the NYSHRL claim of discrimina *683 tion in housing survived because defendants “h[ad] not identified any support for their argument that Phoenix House [was] not the ‘owner, lessee, sub-lessee, assignee, or managing agent of a ‘housing accommodation’ within the meaning of §§ 292(10) and 296(18) (2).” (See Wilson v Phoenix House, 2011 WL 3273179, *5, 2011 US Dist LEXIS 84240, *13 [SD NY, Aug. 1, 2011, No. 10 Civ 7364 (DLC)].) As regards the section 1983 claim, Judge Cote held that plaintiffs claim for compensatory damages pursuant to section 1983 could not proceed because it was barred by the PLRA[1] since Wilson’s mental anguish was not based on any prior physical injury and section 1997e (e) of the PLRA prohibits prisoners from bringing a “Federal civil action . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury.” (42 USC § 1997e [e].) However, Judge Cote concluded that plaintiff’s claim for injunctive relief could proceed, as “Wilson has plead a sufficiently close nexus between the state and Phoenix House such that the defendants’ actions constitute ‘state action’ for purposes of Wilson’s § 1983 claim” (2011 WL 3273179, *3, 2011 US Dist LEXIS 84240, *9).
Plaintiff then requested that her case be voluntarily dismissed, without prejudice, which was so-ordered by Judge Cote on September 6, 2011. Plaintiff thereafter filed the instant action on November 15, 2011.
It is unclear why it took defendants almost two years to submit this pre-answer motion which is presently before the court, but plaintiffs attorneys consented to the extension of time in a stipulation.
The Complaint
Plaintiffs suit alleges five causes of action:
1. that defendants committed housing discrimination and discriminated against her on the basis of her GID disability on several occasions and in January of 2009 when they indicated they would no longer continue to house Ms. Wilson, thereby violating the NYSHRL (Executive Law § 296 [5] [a]);
2. that defendants violated the NYSHRL (Executive Law § 296 [18]), because they refused to make reasonable accommodations in their “rules, policies, practices, or services,” during plaintiffs stay which were necessary so plaintiff, a disabled person, could have an equal opportunity to use and enjoy a dwelling;
*684 3. that defendants violated the New York City Human Rights Law (NYCHRL) (Administrative Code of City of NY § 8-107 [5] [a]), by discriminating against her on the basis of her disability (GID) on several occasions and in wrongfully deciding to terminate her from the program;
4. that defendants violated the New York City Human Rights Law (Administrative Code § 8-107 [15]), because they refused to make reasonable accommodations for Ms. Wilson, a person with a disability, to enable her to enjoy the “right or rights in question provided that the disability is known or should have been known by the covered entity”; and
5. that defendants violated the New York City Human Rights Law (Administrative Code § 8-107 [5] [a]), insofar as they engaged in gender based housing discrimination when, among other instances of discrimination, they indicated that they would no longer continue to house Ms. Wilson at their facility and would terminate her from the program in January of 2009.
Plaintiff requests monetary compensation and punitive damages as well as declaratory relief and an injunction against defendants. Specifically, plaintiff seeks:
1. damages in an amount no less than $2,000,000 to compensate her for “economic loss, loss of rights, as well as for the humiliation, embarrassment, and emotional distress suffered” due to defendants’ discriminatory conduct;
2. punitive damages;
3. a declaratory judgment that defendants violated Executive Law § 291 et seq. (NYSHRL) and Administrative Code § 8-107 et seq. (NYCHRL) because their conduct in this case amounted to discriminatory practices;
4. an order enjoining defendants, their agents, employees, and successors, and all other persons in active concert or participation, from:
a. discriminating against any person in the terms, conditions or privileges of rental of a dwelling because of disability or gender;
b. failing to make reasonable accommodations in rules, practices or services when such accommodations are necessary to afford a person with a disability equal opportunity to use and enjoy a Phoenix House dwelling; and
c. aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the New York State and New York City Human Rights Laws;
*685 5. an order “compelling” defendants and their agents, employees and successors, and all other persons in active concert or participation to:
a. make all necessary modifications to their policies, practices and procedures to comply with the New York State and New York City Human Rights Laws;
b. train all management, agents, and employees about the State and City Human Rights Laws, particularly with respect to transgender rights; and
c. develop written procedures on the proper treatment of transgendered clients, to be distributed to all staff and clients; and
6. an award to plaintiff of reasonable attorneys’ fees, costs, and expenses incurred in prosecuting this action.
Defendants’ Motion to Dismiss
Defendants ask that the action be dismissed for plaintiffs (1) failure to state a claim for which relief may be granted; (2) lack of standing to pursue injunctive relief; and (3) failure to state a claim for punitive damages; and (4) defendant Hargrove also asks that the action be dismissed as against him as an individual defendant.
Transgendered Persons and the Law
The legal and political community has made great strides in the last decade toward assuring legal equality for lesbian, gay and bisexual persons (the LG and B of LGBT). However, with regard to transgendered and other gender nonconforming people, there has been far less progress in addressing their legal rights. In fact, there has been a considerable lack of understanding in the courts with regard to issues of concern to this population. There are only two transgender judges who identify as such in the entire United States, as of this writing. Moreover, there are differences of opinion among lawyers and advocates as to whether to pursue transgender discrimination claims as disability discrimination or as gender discrimination, or on both grounds.
The court notes that transgender litigants with claims of discrimination have had some success with claims under 42 *686 USC § 1983 on both First Amendment[2] and Fourteenth Amendment grounds. (Glenn v Brumby, 663 F3d 1312 [11th Cir 2011]; Smith v City of Salem, Ohio, 378 F3d 566 [6th Cir 2004]; Barnes v City of Cincinnati, 401 F3d 729 [6th Cir 2005]; Lopez v River Oaks Imaging & Diagnostic Group, Inc., 542 F Supp 2d 653, 659-661 [SD Tex 2008]; Mitchell v Axcan Scandipharm, Inc., 2006 WL 456173, 2006 US Dist LEXIS 6521 [WD Pa, Feb. 21, 2006, No. Civ-A 05-243]; Kastl v Maricopa County Community College Dist., 2004 WL 2008954, *2-3, 2004 US Dist LEXIS 29825, *8-9 [D Ariz, June 3, 2004, No. Civ 02-1531-PHX-SRB]; Tronetti v Healthnet Lakeshore Hosp., 2003 WL 22757935, 2003 US Dist LEXIS 23757 [WD NY, Sept. 26, 2003, No. 03-CV-0375E(Sc)]; Schroer v Billington, 424 F Supp 2d 203, 211 [D DC 2006].)
Some of these suits have succeeded for plaintiffs when the courts recognized that, since Price Waterhouse v Hopkins (490 US 228 [1989]),[3] discrimination on the basis of gender stereotypes is sex-based discrimination.[4] Since the decision in Price Waterhouse, federal courts have recognized with near-total uniformity that “the approach in Holloway, Sommers, and Ulane . . . has been eviscerated” by Price Waterhouse’s holding that “Title VII’s reference to ‘sex’ encompasses both the bio *687 logical differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms.” (Glenn, 663 F3d at 1318 n 5; Smith, 378 F3d at 573; see also Schwenk v Hartford, 204 F3d 1187, 1201 [2000].)
The World Health Organization defines “gender” as “the socially constructed roles, behaviours, activities, and attributes that a given society considers appropriate for men and women.”[5]
“Transgender” is an umbrella term applied to a wide variety of people who are said to transgress society’s gender norms in some manner. Typically, the term is applied to people who dress or act in a manner that is different or opposite from what is considered “normal” for their birth gender. According to materials provided at a continuing legal education lecture by Elana Redfield, Esq. of the Sylvia Rivera Law Project, held at New York County Supreme Court in October 2013, “transgender” is a term which covers people who dress in a manner which is associated with one gender, even though they were born as another gender; people who identify as a particular gender, even though they were raised as a different gender; people who do not identify as either male or female; and people who identify partially with one gender and partially with the other.
All human beings have a gender identity, and most people know their gender from a very young age. Generally, one’s gender identity remains the same, no matter what someone looks like, acts like, or what medical procedures they may have, although sometimes a person acknowledges a different gender identity later in their life. As our society evolves, the concept of gender is evolving from a “coercive binary regime” toward a more fluid identification of one’s gender, thus moving claims of gender identity disorder and any concomitant claims of disability into a realm of political unacceptability. But society is not there yet. (See e.g. Dean Spade, Resisting Medicine, Re/Modeling Gender, 18 Berkeley Women’s LJ 15 [2003].)
The attitude toward transgendered people in the recent past by much of society is perhaps best illustrated by the language in Holloway v Arthur Andersen & Co. (566 F2d 659, 664 [9th Cir 1977]), an employment discrimination case, wherein the Ninth Circuit Court of Appeals opined that “transsexualism” is not a suspect class when plaintiff claimed “to have [been] treated discriminatorily [not] because she is male or female, but rather *688 because she is a transsexual who chose to change her sex.” (See also Ulane v Eastern Airlines, Inc., 742 F2d 1081 [7th Cir 1984].)
This view, that gender identity is not immutable but “chosen,” underlies many of the decisions that failed to find discrimination, while acknowledgment that gender is immutable and not chosen is more likely to result in decisions that do find discrimination. See for example McGrath v Toys “R” Us, Inc. (3 NY3d 421, 427-428 [2004]) wherein the Court was asked to answer a question certified by the Second Circuit as to whether plaintiff was entitled to attorneys fees for litigating the first case of “discrimination against transsexuals in public accommodations.” (See also Reyes-Reyes v Ashcroft, 384 F3d 782 [9th Cir 2004]; Kastl v Maricopa County Community College Dist., 2004 WL 2008954, 2004 US Dist LEXIS 29825 [D Ariz, June 3, 2004, No. Civ 02-1531-PHX-SRB]; DeMare v State of Minnesota, 2006 WL 2533922, 2006 Minn App Unpub LEXIS 1005 [Ct App, Sept. 5, 2006, No. A06-803].)
As described in a recent law review Note:[6]
“The legal needs of transgender and other gender nonconforming people are varied and diverse. Gender transgressive people often experience harassment and discrimination that results in social marginalization, including the denial of education, employment, housing opportunities, and health care. Because of this, transgender people are disproportionately affected by poverty and frequently rely upon public assistance programs such as welfare, Medicaid, and foster care. Additionally, the combination of poverty and employment discrimination leads to a disproportionate number of transgender people participating in criminalized economies; therefore, gender nonconforming people are also disproportionately represented in the criminal justice system, court-mandated treatment programs, and prisons. . . .
“While gender nonconforming people have won some legal battles in the past few years, such as the inclusion of gender identity within anti-discrimination laws, the courtroom remains a daunting forum for gender nonconforming people seeking *689 aid or redress. Due to bias within the legal system, even matters as simple as a name change can be unexpectedly problematic. Gender nonconforming people frequently need to access basic legal services that are sensitive to their particular concerns in order to receive public benefits to which they are entitled; access safe housing or homeless shelters; challenge discrimination; access non-discriminatory health care; obtain legal name changes; change their gender designations on official documents; and advocate for better conditions within prisons.”
The TGI Justice Project (based in San Francisco) reports that TGI people (transgender, gender variant and intersex) in prison have reported the following as examples of what they call “an unaddressed human rights crisis”: sexual assault and rape; sexual harassment; physical assault; verbal humiliation; medical neglect; lack of access to hormones and discrimination.[7] There is no question that prison is more difficult for transgender people than for other people, and therefore programs such as defendants’ are even more critical for them.
Standard of Review
In determining a motion to dismiss pursuant to CPLR 3211 (a) (7), the court’s role is ordinarily limited to determining whether the complaint states a cause of action. (Frank v DaimlerChrysler Corp., 292 AD2d 118 [1st Dept 2002].) On such a motion, the court must accept as true the factual allegations of the complaint and accord the plaintiff all favorable inferences which may be drawn therefrom. (Dunleavy v Hilton Hall Apts. Co., LLC, 14 AD3d 479, 480 [2d Dept 2005]; see also Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]; Dye v Catholic Med. Ctr. of Brooklyn & Queens, 273 AD2d 193 [2d Dept 2000].)
The standard of review on such a motion is not whether the party has artfully drafted the pleading, “but whether deeming the pleading to allege whatever can be reasonably implied from its statements, a cause of action can be sustained.” (Offen v Intercontinental Hotels Group, 2010 NY Slip Op 30484[U], *7 [Sup Ct, NY County 2010], citing Stendig, Inc. v Thom Rock Realty Co., 163 AD2d 46 [1st Dept 1990]; see also Leviton Mfg. *690 Co. v Blumberg, 242 AD2d 205 [1st Dept 1997]; Feinberg v Bache Halsey Stuart, 61 AD2d 135, 137-138 [1st Dept 1978]; Edwards v Codd, 59 AD2d 148, 149 [1st Dept 1977].) If the plaintiff can succeed upon any reasonable view of the allegations, the complaint may not be dismissed. (Dunleavy v Hilton Hall Apts. Co., LLC, 14 AD3d 479, 480 [2d Dept 2005]; Board of Educ. of City School Dist. of City of New Rochelle v County of Westchester, 282 AD2d 561, 562 [2001].) The role of the court is to “determine only whether the facts as alleged fit within any cognizable legal theory” (Dee v Rakower, 112 AD3d 204, 208 [2d Dept 2013], citing Leon v Martinez, 84 NY2d 83, 87-88 [1994]). Finally, when considering a motion to dismiss for failure to state a cause of action, the pleadings must be liberally construed. (Offen v Intercontinental Hotels Group, 2010 NY Slip Op 30484[U] [2010].)
As regards the standing issue defendants raise in the branch of their motion to dismiss under CPLR 3211 (a) (3), “[a]s a general rule, ‘where a defendant raises the issue of standing, the plaintiff must prove its standing to be entitled to relief.’ ” (One-west Bank, FSB v Bernstein, 40 Misc 3d 1222[A], 2013 NY Slip Op 51274[U], *4 [Sup Ct, Queens County 2013], citing U.S. Bank N.A. v Dellarmo, 94 AD3d 746 [2d Dept 2012], U.S. Bank, N.A. v Sharif, 89 AD3d 723, 724 [2d Dept 2011], Bank of N.Y. v Silverberg, 86 AD3d 274, 279 [2d Dept 2011], and U.S. Bank, N.A. v Collymore, 68 AD3d 752, 753 [2d Dept 2009].)
A. Failure to State a Claim under the NYSHRL or NYCHRL for Housing Discrimination Based on Plaintiffs Alleged Disability
Defendants move to dismiss these claims on the grounds that plaintiff has insufficiently pleaded any disability — a requisite element of the first four of the five causes of action in plaintiffs complaint.
Defendants also contend that if plaintiff has sufficiently pleaded that she has a disability, they had no notice of the plaintiffs disability and, as such, it was not possible for them to discriminate against the plaintiff on this basis. Defendants argue that plaintiffs factual allegations in the complaint do not demonstrate that sufficient information was put before Phoenix House — such as a diagnosis of GID from a treating physician — to impute knowledge (notice) of her condition to defendants.
Plaintiff counters that dismissal of these claims would be improper because plaintiff was previously medically diagnosed *691 as having GID, and there is no question that defendants regarded or perceived plaintiff as disabled during her stay at Phoenix House. The plaintiff claims Phoenix House’s conduct was such so as to permit the court to impute knowledge to them of plaintiffs disability and, further, that their actions evinced a complete unwillingness to accommodate her disability in contravention of the New York State and New York City Human Rights Laws. Plaintiff cites Administrative Code § 8-107 (15) to support her argument that, even though she may not have presented a report from a doctor to Phoenix House concerning her GID, defendants were nevertheless bound to accommodate her disability because it “should have been known” and that it was apparent to defendants after plaintiffs initial disclosure that she is transgender.
To be clear, the claims under Executive Law § 296 (18) (2) (NYSHRL) and NYCHRL § 8-107 (15) (a) concern defendants’ alleged failure to make reasonable accommodations in their rules and policies to afford plaintiff the right to use and enjoy the treatment program, while the claims under Executive Law § 296 (5) (a) (NYSHRL) and NYCHRL § 8-107 (5) (a) concern defendants’ refusal to allow plaintiff to participate in the program and live at the facility, all four of which are alleged to be housing discrimination on defendants’ part. These are the first four causes of action in plaintiffs complaint.
Res Judicata and Collateral Estoppel
Plaintiff argues that the doctrine of res judicata and, “in particular, issue preclusion” (or collateral estoppel) dictates the denial of defendants’ motion to dismiss her claims under the NYSHRL and the NYCHRL. Plaintiff claims the identical issue (as required by Schwartz v Public Adm’r of County of Bronx, 24 NY2d 65, 69 [1969] and its progeny) was decided in her withdrawn federal action, so to allow a de novo review of defendants’ motion to dismiss these claims would constitute an impermissible “second bite” at the apple.
Plaintiff asserts that the defendants’ motion to dismiss in federal court was identical to their instant motion to dismiss and that the federal court’s denial of defendants’ motion as to the identical[8] state law claims bars dismissal as to those claims now. This is so, according to plaintiff, because defendants are unable to establish, as a matter of law, that the federal action *692 did not afford them a full and fair opportunity to argue for dismissal of the state law claims in the federal proceeding.
Plaintiff also avers that res judicata bars the defendants from litigating matters relating to plaintiffs state disability discrimination claims that defendants might have raised in the federal action. Plaintiff cites Schuylkill Fuel Corp. v Nieberg Realty Corp. (250 NY 304, 306-307 [1929]) for the proposition that
“[a] judgment in one action is conclusive in a later one not only as to any matters actually litigated therein, but also as to any [matters] that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first.”
Thus, plaintiff argues, because the federal court in this case rejected the same motion to dismiss the same NYSHRL disability discrimination claims arising out of the same operative facts, defendants are now barred from arguing that plaintiff is not disabled; that Phoenix House is not a “housing accommodation”; that the discrimination complained of was not in connection with a housing accommodation; that Phoenix House is not a “dwelling”; that they did not know of her disability; and that the discrimination was not in conjunction with the rental, etc. of housing.
It also appears to be plaintiffs contention that since the federal court did not dismiss the plaintiffs state law claims, and the city law claims brought in the current action are virtually identical to the state law claims, that res judicata should bar dismissal of both the State Human Rights Law claims and the New York City Human Rights Law claims.
In summary, plaintiff avers that the doctrine of res judicata and, in particular, issue preclusion (or collateral estoppel) prevents this court from dismissing the state and city law claims. Plaintiffs argument is that Judge Cote’s August 1, 2011 order denying defendants’ motion to dismiss plaintiffs section 296 (18) (2) claim precludes this court’s dismissal of that claim, as well as of the other State and City Human Rights Laws claims now at issue. In the defendants’ response, defendants cite a line of cases for the proposition that where, as here, a federal case is dismissed voluntarily pursuant to Federal Rules of Civil Procedure rule 41 (a) (1), such dismissal precludes application of res *693 judicata or collateral estoppel by reference to the prior order of the federal court. Defendants are correct on this point. Neither res judicata nor collateral estoppel apply to this action, and thus the court is not precluded from dismissal of the claims under the NYSHRL in this action solely on that basis.
Generally, issue preclusion applies where (1) the parties to the instant action are the same as the parties in the prior litigation, the outcome of which is now said to control; (2) there is an identity of issues which has been decided in the prior action and is thus decisive as regards the present action; and (3) there must have been a full and fair opportunity to contest the issues which resulted in the decision now said to be controlling. (Kret v Brookdale Hosp. Med. Ctr., 93 AD2d 449 [2d Dept 1983], affd 61 NY2d 861 [1984]; Schwartz v Public Adm’r of County of Bronx, 24 NY2d 65, 69 [1969].) Furthermore, the burden rests upon the proponent of a claim of issue preclusion to demonstrate the identical nature and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in the prior proceeding. {Parker v Blauvelt Volunteer Fire Co., 93 NY2d 343 [1999].)
However, where, as here, a plaintiff voluntarily discontinues an action in federal court and subsequently brings suit for the same relief, arising out of the same events, against the same defendants in state court, issue preclusion has been held not to apply, and the previous federal decision is not res judicata. In S.C. Compania Nationala De Transporturi Aeriene Romane Tarom SA v Altarovici (19 Misc 3d 1121[A], 2008 NY Slip Op 50800[U], *4 [Sup Ct, Kings County 2008]), the court explained:
“ ‘A voluntary dismissal without prejudice leaves the situation as if the [first] action had never been filed.’ (9 Wright and Miller, Federal Practice and Procedure, Section 2367). ‘The effect of a voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought. ... It carries down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect to plaintiffs claim. . . . Neither res judicata nor collateral estoppel is traditionally applicable to a voluntary dismissal.’ (In re Piper Aircraft Distribution System Antitrust Litigation, 551 F2d 213, 219 [8th Cir. 1977]). This provision of *694 the Federal Rules of Civil Procedure[9] is similar to Civil Practice Law and Rules 3217 (c) (see Housberg v Baker, 146 Misc 2d 960, 962 [1990]).”
Thus, the order of Judge Cote does not prohibit this court from deciding defendants’ motion to dismiss. However, the court must note that Judge Cote’s decision still has value as a helpful analysis of the unique issues herein.
Participation in Phoenix House’s Program is “Housing”
In addition to arguing that res judicata and collateral estoppel should apply, as discussed above, plaintiff addresses the merits and argues that her claim should survive because, contrary to defendants’ contentions, the proper definition of “dwelling” is not contained in Executive Law § 292 (12), but rather, the court should utilize the term’s plain meaning, as contained in The American Heritage College Dictionary. Specifically, plaintiff states “dwelling” in the instant case should be construed as “[a] place to live in; an abode” (The American Heritage College Dictionary [5th ed 2013], dwelling), and that such construction is proper, citing numerous decisions. Plaintiff argues that, were the court to adopt defendants’ position — that a “dwelling” is exclusively as is defined in Executive Law § 292 (12), as a “home of three or more families living independently of each other”— such a conclusion would be inapposite to basic statutory construction. Finally, plaintiff states that if the court does wish to look to a statute for a definition of dwelling, the proper statute to consider is Multiple Dwelling Law § 4 (4). Therein, avers plaintiff, exists a definition of dwelling “consonant with the plain meaning of the word,” i.e., “[a] ‘dwelling’ is any building or structure or portion thereof which is occupied in whole or in part as the home, residence or sleeping place of one or more human beings.”
The parties thus each urge upon the court a different definition of “dwelling,” one that supports their respective positions in the motion under consideration. Since the New York State Human Rights Law does define “housing accommodation,” as discussed below, this argument about the definition of “dwelling” is irrelevant. Nonetheless, it must be clarified that the definition in Executive Law § 292 (12) is not a definition of “dwelling,” as erroneously argued by defendants, which is generally meant to be a place to live, but a definition of “multiple dwelling” which, for purposes of the NYSHRL is meant to separate *695 claims of discrimination in housing with multiple units held as investment property from that which is owner-occupied. The legislative history for this distinction is not relevant herein. However, it must be clear that defendants’ reference to the definition of “multiple dwelling” in the NYSHRL as a definition of “dwelling” is misplaced. The real issue is whether Phoenix House is a “housing accommodation” as defined in Executive Law § 292 (10).
The defendants move to dismiss the plaintiffs New York State and New York City Human Rights Laws claims on the ground that both housing discrimination laws apply to landlords but not to institutions serving as drug treatment facilities for criminal court program participants. However, this is not how the NYSHRL or NYCHRL have been interpreted and applied.
Section 296 (18) (2) of the Executive Law states, in relevant part:
“It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right of ownership of or possession of or the right to rent or lease housing accommodations: . . .
“(2) To refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling, including reasonable modification to common use portions of the dwelling” (emphasis added).
The NYSHRL defines “housing accommodation” as “any building, structure, or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied, as the home, residence or sleeping place of one or more human beings.” (Executive Law § 292 [10].) Defendants have not identified any support for their argument that Phoenix House is not the “owner, lessee, sub-lessee, assignee, or managing agent of’ a “housing accommodation” within the meaning of sections 292 (10) and 296 (18) (2).
Defendants also argue that, to the extent that plaintiff’s complaint alleges defendants’ actions deprived her of the “opportunity to use and enjoy a dwelling” as required by section 296 (18) (2), defendants urge upon the court the conclusion that their residential drug treatment program is not a housing accommodation subject to the New York State Human Rights Law. *696 Defendants argue that Phoenix House is not a dwelling either, due to the fact that Phoenix House does not provide a permanent residence which is “either sold, rented, leased, let or hired out,” thus undermining plaintiffs claim, which should be dismissed.
Executive Law § 296 prohibits the owners of both private and publicly assisted housing accommodations from refusing to make reasonable accommodations in their rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling. (Matter of Doe v Bell, 194 Misc 2d 774 [Sup Ct, NY County 2003].) A residential treatment facility which is funded by the State as an alternative to incarceration is clearly a publicly assisted housing accommodation.
In Matter of Doe v Bell (194 Misc 2d 774 [Sup Ct, NY County 2003]), a teen in a group foster care home for boys was legally in the custody of the Administration for Children’s Services (ACS) of the City of New York, and was denied permission to wear women’s clothing. The court found that the teen had been diagnosed with GID, that GID was a disability under the New York State Human Rights Law, Executive Law § 291 et seq., and that while ACS’s clothing policy did not discriminate against the minor based on her disability, as the policy was facially neutral, exempting her from the home’s dress code was held to be a “reasonable accommodation” ACS was obligated to make. The court also held that ACS’ obligation to act in a nondiscriminatory fashion is not satisfied merely by providing a small number of facilities at which minors with GID are assured of nondiscriminatory treatment. The court held that at each and every residential facility run and operated by the ACS, which are “housing accommodations” under the statute, the City must comply with the Human Rights Law’s mandate to provide reasonable accommodations to persons with disabilities.
Defendants’ argument that the court should dismiss the plaintiffs claims on the grounds that Phoenix House cannot be properly considered a dwelling must be denied. This argument is unpersuasive in light of the case law in New York interpreting the applicable statutes and code sections.
It is noted that Judge Cote, in the federal action, concluded, “Defendants have not identified any support for their argument that Phoenix House is not the ‘owner, lessee, sub-lessee, assignee, or managing agent of a ‘housing accommodation’ within the meaning of §§ 292(10) and 296(18) (2)” (2011 WL 3273179, *5, 2011 US Dist LEXIS 84240, *13).
*697 Disability
Under the New York State Human Rights Law, Executive Law § 291 et seq., the term “disability” is broadly defined. Disability means “a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.” (Executive Law § 292 [21]; State Div. of Human Rights v Xerox Corp., 65 NY2d 213, 219 [1985]; see also Hazeldine v Beverage Media, Ltd., 954 F Supp 697, 706 [SD NY 1997]; Reeves v Johnson Controls World Servs., Inc., 140 F3d 144, 155-156 [2d Cir 1998].) In Reeves, the court said that, under Xerox, plaintiffs panic disorder was a disability under the State Human Rights Law. The court found that a
“literal reading of the statute . . . treats a medically diagnosable impairment as necessarily a disability for purposes of the NYSHRL. Thus, an individual can be disabled under the [NYSHRL] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual’s normal activities” (id. at 155).
The New York State Human Rights Law, Executive Law § 291 et seq., provides that disabilities are not limited to physical or mental impairments but may also include “medical impairments.” In addition, to qualify as a disability, the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function, or (2) by being demonstrable by medically accepted clinical or diagnostic techniques. “Fairly read, the [Human Rights Law] covers a range of conditions varying in degree from those involving the loss of a bodily function to those which are merely diagnosable medical anomalies which impair bodily integrity and thus may lead to more serious conditions in the future.” (Matter of Doe v Bell, 194 Misc 2d 774, 779 [2003], quoting State Div. of Human Rights v Xerox Corp., 65 NY2d 213, 218-219 [1985].) An individual can thus be disabled under the New York State Human Rights Law, Executive Law § 291 et seq., if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual’s normal activities. (Matter of Doe v Bell, 194 Misc 2d 774 [2003].)
Gender identity disorder is a disability under both the New York State Human Rights Law and the New York City Human Rights Law. (Maffei v Kolaeton Indus., 164 Misc 2d 547 *698 [Sup Ct, NY County 1995]; Matter of Doe v Bell, 194 Misc 2d 774 [2003].) It has also been held to be a disability for purposes of Social Security disability, which must reference state law and not federal law for the definition. (Manago v Barnhart, 321 F Supp 2d 559 [ED NY 2004].) Gender identity disorder was first listed in DSM-III in 1980. Gender identity disorder is defined by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text-Revised (DSM-IV-TR) as a mental illness characterized by “a strong and persistent cross-gender identification.”[10] Individuals with GID experience “ ‘[p]ersistent discomfort with [their] sex or sense of inappropriateness in the gender role of that sex,’ and in adults ‘the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics ... or belief that he or she was born the wrong sex.’ ” (Soneeya v Spencer, 851 F Supp 2d 228, 231 [D Mass 2012].)
The course of treatment for gender identity disorder generally followed in the medical community is governed by the Standards of Care (SOC) promulgated by the World Professional Association for Transgender Health.* [11] The seventh version was released in September 2011, after plaintiff filed her initial complaint in this case. Both the sixth version and the seventh version of the SOC are relevant to the instant proceeding. The sixth provides the standards for plaintiffs time at defendants’ treatment facility, and because plaintiff seeks prospective injunctive relief, the seventh version provides the health care standards for treatment of GID going forward.
The Standards of Care are generally understood to be flexible clinical guidelines, which individual health professionals and programs may modify. The Standards of Care explicitly state that “[c]linical departures from the SOC may come about because of a patient’s unique anatomic, social, or psychological situation; an experienced health professional’s evolving method of handling a common situation; a research protocol ... or the need for specific harm reduction strategies.” (Soneeya v Spencer, 851 F Supp 2d 228, 232 [2012].)
*699 The Standards of Care put forth three major areas of therapy for GID, which consist of: (1) hormone therapy; (2) experience living as a member of the opposite sex; and (3) sex reassignment surgery. (Kosilek v Maloney, 221 F Supp 2d 156, 166 [D Mass 2002].) Not all persons suffering from GID want or require all three types of therapy in order to alleviate their gender dysphoria. Ultimately, the level of treatment that a patient requires depends on the nature of their GID condition. The treatment of gender dysphoria has become even more individualized with the adoption of the seventh version of the Standards of Care. (Soneeya v Spencer, 851 F Supp 2d 228 [2012].) The New York State Human Rights Law, Executive Law § 291 et seq., is not simply a prohibition of discriminatory actions taken because of a person’s disability. Quite the contrary, the State Human Rights Law requires covered entities to provide persons with disabilities with reasonable accommodations not offered to non-disabled persons in order to ensure that persons with disabilities enjoy “equality of opportunity.” Executive Law § 296 (18) (2) requires, for example, the provision of reasonable accommodations in rules, policies, and practices when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. (Matter of Doe v Bell, 194 Misc 2d 774 [2003].) On the facts of this case, plaintiff alleges that she was entitled to experience living as a member of the opposite sex as part of her treatment for her GID and that defendants should have permitted her to do so as a reasonable accommodation.
The scope of the disability discrimination provisions of the New York State Human Rights Law, Executive Law § 291 et seq., are similar to, but broader than, the Federal Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act (29 USC § 794), a precursor to the ADA. The ADA specifically excludes gender identity disorder from classification as a disability. (42 USC § 12211 [b].)[12]
To the extent that defendants argue that since defendants were not made aware of plaintiffs GID diagnosis and thus did not know of her disability, so they couldn’t have discriminated against her on that basis, their argument fails as a matter of law. The court in Matter of Doe v Bell (194 Misc 2d 774 [Sup Ct, NY County 2003]) interpreted the State Human Rights Law *700 section at issue in this case. The court in the first instance found that GID constitutes a disability under the New York State Human Rights Law, as have several other courts. (Hispanic AIDS Forum v Estate of Bruno, 16 AD3d 294 [1st Dept 2005]; Rentos v OCE-Off. Sys., 1996 WL 737215, 1996 US Dist LEXIS 19060 [SD NY, Dec. 24, 1996, No. 95 Civ 7908 LAP]; Doe v City of New York, 42 Misc 3d 502 [Sup Ct, NY County 2013].) But more importantly, the NYCHRL covers both actual and perceived disabilities. Administrative Code § 8-102 (16) (a) in pertinent part states: “The term ‘disability’ means any physical, medical, mental or psychological impairment, or a history or record of such impairment.” NYCHRL § 8-107 (5) (a) (2) states that it is illegal “[t]o discriminate against any person because of such person’s actual or perceived . . . disability” (emphasis added).
Further, the law requires that the court assume the truth of the allegations in the complaint and review the complaint in the light most favorable to the non-moving party. (See Negri v Stop & Shop, 65 NY2d 625 [1985].) Utilizing that analysis, plaintiff makes out a cause of action for housing discrimination based on her disability sufficient to survive a motion to dismiss.
B. Failure to State a Claim of Gender Discrimination under the NYCHRL
Pursuant to CPLR 3211 (a) (7), defendants also move to dismiss plaintiffs claims under Administrative Code (NYCHRL) § 8-107 (5) (a) for gender discrimination. This is plaintiffs fifth cause of action in her complaint. However, neither the defendants’ motion nor their memo of law address this cause of action in any substantive way. Defendants say, “The cited law is inapplicable . . . [as plaintiff’s claims refer] to the substance abuse treatment and not to her living arrangements.” As the court has previously concluded herein, for purposes of the Human Rights Law, a person sent to Phoenix House for residential treatment by the court as a sentence which is an alternative to incarceration is residing at Phoenix House, and as such, for the participant, it is a housing accommodation.
New York City Human Rights Law § 8-107 (5) (a) reads, in relevant part:
“It shall be an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignee, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation, constructed or to *701 be constructed, or an interest therein, or any agent or employee thereof:
“(1) To refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold from any person or group of persons such a housing accommodation or an interest therein because of the actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, marital status, partnership status, or alienage or citizenship status of such person or persons, or because of any lawful source of income of such person or persons, or because children are, may be or would be residing with such person or persons.
“(2) To discriminate against any person because of such person’s actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, marital status, partnership status, or alienage or citizenship status, or because of any lawfid source of income of such person, or because children are, may be or would be residing with such person, in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith.” (Emphasis added.)
The court notes that the New York City HRL law defines the term “gender” as “including] actual or perceived sex and . . . also including] a person’s gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.” (Administrative Code § 8-102 [23].) Accordingly, discrimination based on gender identity is impermissible gender discrimination under the New York City Human Rights Law.
Defendants argue that plaintiff has failed to state a claim insofar as neither Phoenix House nor Sydney Hargrove can be said to have discriminated with respect to plaintiffs gender in the “sale, rental or lease” of housing, as it is an uncontroverted fact that plaintiffs stay at Phoenix House was occasioned by her confinement there pursuant to New York’s Drug Treatment Alternative to Prison. Rather, according to defendants, plaintiffs allegations concern
“decisions and instructions conveyed to her by *702 [Phoenix House] clinical and counseling staff regarding her appearance and participation in classes and therapy and support groups — which were all part of her substance abuse treatment program — and not in the ‘terms, conditions or privileges of the sale, rental or lease’ of a housing accommodation.”
In short, defendants argue that a residential treatment program such as Phoenix House does not qualify as a housing accommodation such that the New York State or City Human Rights Laws claims are cognizable.
The plaintiff, in opposition to defendants’ motion, once again avers that, even if res judicata or collateral estoppel do not bar dismissal of plaintiff’s claim, dismissal would nevertheless be improper as the complaint states a claim upon which relief can be granted both at law and at equity.
It is plaintiff’s position that defendants’ argument that no housing discrimination could occur because Phoenix House is not a “housing accommodation,” avoids the fact that treatment at Phoenix House was, by its very terms, residential. According to plaintiff, defendants attempt to mislead the court by emphasizing the treatment aspect of plaintiffs stay at Phoenix House as though to imply that Ms. Wilson was only a “day visitor” at the facility rather than part of a live-in treatment program. Plaintiff goes on to note that she did in fact sleep and eat at this facility and thus can be said to have resided there and, furthermore, cites to the website of Phoenix House where it is written that “[c]lients in [their] residential programs live and work together.” (Emphasis added.) Plaintiff contends these facts bring Phoenix House squarely within the ambit of the definition of “housing accommodation” in Administrative Code § 8-102 (10) — which, she opines, controls, insofar as the definition of housing accommodation is concerned. This definition is identical to the definition of “dwelling” in Multiple Dwelling Law § 4 (4), the court notes.
The court has already determined that, for the purposes of the City and State Human Rights Laws, Phoenix House is a dwelling and a housing accommodation, with regard to its residential clients. It is noted that plaintiff argues persuasively that defendants’ emphasis on the absence of a sale, lease or rental of housing is misplaced in this case given the language of NYCHRL § 8-107 (5) (a). It is plaintiffs position that the statute does not require discrimination in connection with the sale, rental, or *703 lease of housing accommodations; rather she contends the phrase “right to rent or lease” only modifies one of many categories of possible housing accommodations in the law. Indeed, the word “or” appears between the first phrase and the next, which refers to discrimination “committed in the furnishing of facilities or services in connection” with a housing accommodation. Plaintiff has clearly pleaded a cause of action within the ambit of the second part of that phrase, by alleging that defendant violated NYCHRL § 8-107 (5) (a). This is also true as regards the provision of the New York City Human Rights Law “otherwise deny to or withhold from any person or group of persons such a housing accommodation or an interest therein.” As discussed more fully below, discrimination against a person because of gender nonconformity is discrimination on the basis of gender and/or sex.
For these reasons, the plaintiffs fifth cause of action, for housing discrimination based on gender under NYCHRL § 8-107 (5) (a), is not dismissed.
C. Standing to Sue for Injunctive Relief
Pursuant to CPLR 3211 (a) (3), defendants move to dismiss plaintiffs prayer for injunctive relief on the theory that plaintiff has no standing to request such relief. Defendants’ argument primarily rests on their assertion that plaintiff cannot meet all the requirements of the law: (1) plaintiff must show injury-in-fact — i.e., that when she filed her complaint in this court or anytime thereafter she faced a likelihood of future harm from Phoenix House’s alleged discriminatory conduct toward her; (2) plaintiff must plead or show any “official policy or its equivalent” pursuant to which she claims she was injured; and (3) plaintiff must show that she faces “irreparable injury” absent the injunction, which defendants claim she cannot show because she is not currently a Phoenix House client. In addition, defendant argues that plaintiff has alleged that compensatory damages will provide her with adequate relief and this, according to defendants, eviscerates her ability to request injunctive relief.
Plaintiff responds that there are three reasons she has standing to request injunctive relief: (1) both the New York State and New York City Human Rights Laws expressly provide that victims of discrimination are entitled to seek injunctive relief; (2) New York courts have ruled there is no requirement to show an ongoing injury in cases involving discrimination for injunctive relief to be appropriate; and (3) the cases upon which de *704 fendants rely to support the notion that there must be an ongoing injury for injunctive relief to be appropriate are, in fact, inapposite. Plaintiff cites both (NYSHRL) Executive Law § 297 (9) and (NYCHRL) Administrative Code § 8-502 to support her claim that there is a statutory basis for injunctive relief in cases of discrimination.
Plaintiff also argues that decisional law is clear that “ [discrimination, once established, has a redolence that lingers well beyond the initial experience of bias,” which makes injunctive relief appropriate in the case at bar. (Affirmation in opposition at 35.)
Finally, plaintiff opposes dismissal of the claim for injunctive relief on the grounds of standing by arguing that none of the cases upon which defendants’ rely in their motion — insofar as the motion relates to standing — have anything to do with discrimination.
Plaintiff is correct concerning the inapposite nature of the cases cited by defendants. In support of their position, defendants cite Koeppel v Schroder (122 AD2d 780 [2d Dept 1986]) and W.T. Grant Co. v Srogi (52 NY2d 496 [1981]). Koeppel concerns a preliminary injunction in a law firm dissolution. W.T. Grant also concerns a preliminary injunction and is a challenge to government action. Defendants also cite New York State Assn, of Nurse Anesthetists v Novello (2 NY3d 207 [2004]), which concerns an injunction issued to a union which the court set aside as based upon speculative future injuries to its members and not an “in fact injury.” The analysis again involves a challenge to government action; in the instant matter, while Phoenix House was paid by the government for plaintiffs treatment, Phoenix House is not a government-run program. It is clear that the requirement that plaintiff must plead or show an “official government policy or its equivalent” pursuant to which she was injured is not required in cases involving private actors.
The cases cited by defendants in support of their argument that plaintiff cannot seek both compensatory damages and injunctive relief are also not on point. Both Dana Distribs., Inc. v Crown Imports, LLC (48 AD3d 613 [2d Dept 2008]) and Eastman Kodak Co. v Carmosino (77 AD3d 1434 [4th Dept 2010]) concern preliminary injunctions.
In fact, plaintiffs have been allowed to pursue both compensatory damages and injunctive relief in cases brought under the NYC and NYS Human Rights Laws. (See e.g. Degregorio v Richmond Italian Pavillion, Inc., 90 AD3d 807 [2d Dept 2011]; *705 Dominguez v Department of Educ. of the City of N.Y., 37 Misc 3d 1205[A], 2012 NY Slip Op 51899[U] [Sup Ct, NY County 2012].)
Plaintiff is not immune to the error of citing cases that are inapposite. Plaintiff cites the decision of the Second Circuit Court of Appeals in LeBlanc-Sternberg v Fletcher (104 F3d 355 [2d Cir 1996] [table; text at 1996 WL 699648, 1996 US App LEXIS 31800 (1996)]) to argue it is indeed appropriate in cases of discrimination for a court to issue an injunction that prohibits future discrimination. This is an unpublished decision which concerns alleged violations under the U.S. Constitution and the Fair Housing Act (FHA) (42 USC § 3601 et seq.), and is inapplicable to the instant matter.
The proper analysis requires a review of the statutes sued under, the NYS and NYC Human Rights Laws, to see what relief they provide for.
The state statute cited by plaintiff, Executive Law § 297, outlines the procedures of the New York State (NYS) Division of Human Rights; its sole reference to injunctive relief is as follows:
“§ 297. Procedure . . .
“6. At any time after the filing of a complaint with the division alleging an unlawful discriminatory practice under this article, if the division determines that the respondent is doing or procuring to be done any act tending to render ineffectual any order the commissioner may enter in such proceeding, the commissioner may apply to the supreme court in any county where the alleged unlawful discriminatory practice was committed, or where any respondent resides or maintains an office for the transaction of business, or if the complaint alleges an unlawful discriminatory practice under subdivision two-a or paragraph (a), (b) or (c) of subdivision five of section two hundred ninety-six of this article, where the housing accommodation, land or commercial space specified in the complaint is located, or, if no supreme court justice is available in such county, in any other county within the judicial district, for an order requiring the respondents or any of them to show cause why they should not be enjoined from doing or procuring to be done such act. The order to show cause may contain a temporary restraining order and shall be served in the manner provided therein. On the return date of the *706 order to show cause, and after affording all parties an opportunity to be heard, if the court deems it necessary to prevent the respondents from rendering ineffectual an order relating to the subject matter of the complaint, it may grant appropriate injunctive relief upon such terms and conditions as it deems proper.”
Thus, injunctive relief may be granted to the NYS Division of Human Rights, but not to a private plaintiff. (See Matter of Ithaca City School Dist. v New York State Div. Human Rights, 87 AD3d 268 [3d Dept 2011].) Further, that agency is authorized to commence administrative complaints of discrimination on its own initiative. (See Town of Oyster Bay v Kirkland, 81 AD3d 812 [2d Dept 2011], affd 19 NY3d 1035 [2012].) However, the NYS Human Rights Law does not create any right to injunctive relief in private civil actions filed in a court, which would be applicable to the instant action.
In the instant matter, it seems clear that without an explicit provision permitting such relief in the New York State Human Rights Law, plaintiff cannot demonstrate all the elements which are otherwise required to establish standing for injunctive relief under state law. She cannot establish that she faces a likelihood of future harm from the discrimination she alleged was perpetrated by Phoenix House. Nor can she claim she faces irreparable injury absent a grant of relief, given she is no longer a Phoenix House resident. Therefore, the court must dismiss plaintiff’s claims for injunctive relief concerning her causes of action under the NYSHRL.
By contrast, Administrative Code § 8-502 (a) does create a right to injunctive relief:
“§ 8-502. Civil action by persons aggrieved by unlawful discriminatory practices.
“a. Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or by an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate, unless such person has filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory *707 practice or act of discriminatory harassment or violence. For purposes of this subdivision, the filing of a complaint with a federal agency pursuant to applicable federal law prohibiting discrimination which is subsequently referred to the city commission on human rights or to the state division of human rights pursuant to such law shall not be deemed to constitute the filing of a complaint under this subdivision” (emphasis added).
Clearly, injunctive relief is available under the City’s Human Rights Law. Further, this provision was intended to give enhanced protection against discrimination and “reflects the broad policy behind the local law to discourage discrimination.” (Krohn v New York City Police Dept., 2 NY3d 329 [2004]; see also Administrative Code § 8-101 [“there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences”]; Administrative Code § 8-130 [which states that the Administrative Code provisions should be liberally construed].)
It is unclear from the case law whether the courts have found any requirement that a plaintiff must show “injury in fact” or that plaintiff faces “irreparable injury” absent the injunction to seek permanent injunctive relief under the NYC Human Rights Law. In fact, there are few reported cases where this could conceivably have been raised as an issue.
In Degregorio v Richmond Italian Pavilion, Inc. (2010 NY Slip Op 30743[U] [2010], affd 90 AD3d 807 [2d Dept 2011]), the court, after a bench trial, granted injunctive relief under the NYC Human Rights Law to a restaurant patron who was denied entry because he was accompanied by a guide dog. It is unclear from the record whether plaintiff pleaded “injury in fact” or “irreparable injury,” but common sense implies such would not be necessary, as he had other restaurant choices.
In People v Garban, LLC (1999 WL 496182, 1999 NY Misc LEXIS 390, 80 Fair Empl Prac Cas [BNA] 351 [Sup Ct, NY County 1999], vacated in part and settled 2000 NY Mise LEXIS 664 [Sup Ct, NY County 2000]), the State Attorney General sought punitive damages on behalf of the State of New York, under Administrative Code § 8-502, which, the court noted, “provides that ‘any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of ac *708 tion . . . for damages, including punitive damages, and for injunctive relief ” (1999 WL 496182, *5, 1999 NY Misc LEXIS 390, *13). The court goes on to note that “the New York City Council, in enacting § 8-502 of the Administrative Code, authorized broader penalties for unlawful discriminatory practices in the City, in that it authorized an ‘aggrieved’ person to sue for punitive damages,” but stated that the State Attorney General could not be deemed an “aggrieved” party under that local law and therefore lacked standing (id.). The clear implication was that an “aggrieved person,” unlike the State Attorney General, has standing to seek punitive damages, and by the same logic, one may conclude that an “aggrieved person” also has standing to seek injunctive relief as both are listed in the same sentence in section 8-502 (a).
Using the standard set forth in Matter of Fritz v Huntington Hosp. (39 NY2d 339 [1976]), the court finds that, in the case of the City Human Rights Law, the City’s legislative body has enacted a law which anticipates the vigilant enforcement of rights thereunder and explicitly states that “any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title” shall have a cause of action in any court of competent jurisdiction for injunctive relief (Administrative Code § 8-502 [a]). There can be no doubt that plaintiff has stated claims of multiple unlawful discriminatory practices under chapter one of the NYC Human Rights Law, within the zone of interest intended to be protected by the law, and therefore has standing to pursue injunctive relief.
As such, the branch of defendants’ motion requesting dismissal of plaintiffs claims for injunctive relief regarding defendants’ alleged discriminatory practices under the NYCHRL is denied, and the branch seeking dismissal of the plaintiffs claims for injunctive relief under the NYSHRL is granted.
D. Punitive Damages
Defendants point to the New York Court of Appeals decision in Ross v Louise Wise Servs., Inc. (8 NY3d 478, 489 [2007]) to support their argument that plaintiff has failed to state a claim for punitive damages. It is defendants’ position that, even if they discriminated against plaintiff (which nowhere do they concede), their conduct does not evince the “high degree of moral turpitude” or “wanton dishonesty as to imply criminal indifference to civil obligations” as required by law for punitive damages to attach. Moreover, defendants point to Prozeralik v *709 Capital Cities Communications (82 NY2d 466, 479 [1993]) as support for dismissal of plaintiffs claims for punitive damages. In that case, the New York Court of Appeals held “[something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage . . . or a fraudulent or evil motive on the part of the defendant” {id.). Defendants thus aver that plaintiffs complaint is bereft of any allegations which indicate such an evil motive on their part as to justify an award of punitive damages.
Plaintiff responds that dismissal of her claim for punitive damages on the grounds set forth in defendants’ motion would be inappropriate because both the New York State and New York City Human Rights Law expressly permit the award of punitive damages. In this regard, plaintiff cites Executive Law § 297 (9) and Administrative Code § 8-502.
Plaintiff then argues that defendants’ conduct in the case at bar does meet the threshold for punitive damages laid out by the Court of Appeals in Ross v Louise Wise Servs., Inc., thereby disputing defendants claim that any discriminatory conduct on their part, if found, would not meet the requirements of Ross.
Executive Law § 297 (9) states, in relevant part:
“Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of housing discrimination only, punitive damages, and such other remedies as may be appropriate, including any civil fines and penalties provided in subdivision four of this section” (emphasis added).
It is clear that punitive damages are available in the NYSHRL only in housing discrimination cases. In contrast to the restriction to housing discrimination under the NYSHRL, the language in the NYCHRL is broader:
“Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or by an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate.” (Administrative Code § 8-502 [a].)
*710 The NYCHRL provisions were intended to give “enhanced protection against discrimination” and reflect the broad public policy behind the NYCHRL to discourage discrimination. (Krohn v New York City Police Dept., 2 NY3d 329, 336 [2004]; see also Administrative Code § 8-101 [“there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences”]; Administrative Code § 8-130 [which states that the Code provisions should be liberally construed].)
The Administrative Code of the City of New York clearly states that a person claiming to be aggrieved by an unlawful discriminatory practice can bring a cause of action alleging unlawful discrimination and seek punitive damages as a remedy. (See Administrative Code § 8-502.) The New York State Executive Law clearly states that a person claiming to be aggrieved by an unlawful discriminatory practice with respect to housing can bring a cause of action alleging unlawful discrimination and seek punitive damages as a remedy. (See Executive Law § 297 [9].) Neither the Administrative Code nor the Executive Law set forth the standard of proof that is necessary for a plaintiff to recover punitive damages. However, when local civil rights laws are silent with regard to legal standards, the courts tend to follow the guidelines established under federal law. (See Umansky v Masterpiece Intl., 276 AD2d 692 [2d Dept 2000]; Ferrante v American Lung Assn., 90 NY2d 623 [1997].)
The New York State and federal courts have found a substantial identity between the language and purposes of Executive Law § 296 (5), Administrative Code § 8-107, and the federal Fair Housing Act (42 USC § 3601 et seq.; see Stalker v Stewart Tenants Corp., 93 AD3d 550 [2012]; Sayeh v 66 Madison Ave. Apt. Corp., 73 AD3d 459, 461 [1st Dept 2010]; Mitchell v Shane, 350 F3d 39, 47 n 4 [2d Cir 2003]). The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered from discriminatory housing practices. (42 USC § 3613 [c] [1].) A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence that the defendant “discriminate[d] in the face of a perceived risk that its actions . . . violate[d] federal law,” or were “egregious or outrageous acts that may serve as evidence supporting an inference of the requisite ‘evil motive.’ ” (United States v Space Hunters, Inc., 429 F3d 416, 427 [2d Cir 2005] [internal quotation marks omitted].) Punitive damages are thus limited “to cases in which the *711 [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.” (Id.; Kolstad v American Dental Assn., 527 US 526, 529-530 [1999].) “Malice and reckless indifference refer to ‘the [defendant’s] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.’ ” (United States v Space Hunters, Inc., 429 F3d 416, 427 [2d Cir 2005]; Farias v Instructional Sys., Inc., 259 F3d 91, 101 [2d Cir 2001]; Kolstad, 527 US at 535.)
In Stalker v Stewart Tenants Corp. (93 AD3d 550 [1st Dept 2012]), which alleges a refusal by a cooperative board to approve a contract to sell a unit because of discrimination on the basis of age and national origin, the First Department reversed an order dismissing plaintiffs’ claim for punitive damages. The Court noted that “[t]he complaint states a cause of action for housing discrimination under New York State’s Human Rights Law (Executive Law § 296 [5])” (id. at 551), which makes it an unlawful discriminatory practice to “discriminate against any person” on the basis of “race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.” (Executive Law § 296 [5] [a] [2].) The Court goes on to note, “We find that this more expansive language provides a remedy for any person ‘adversely affected by reason of discrimination’ in the provision of housing in New York.” (93 AD3d at 551.)
Similarly, in Axelrod v 400 Owners Corp. (189 Mise 2d 461 [Sup Ct, NY County 2001]), plaintiff alleged that a cooperative board’s refusal to approve a sale constituted discrimination on the basis of age and familial status, in violation of both the Executive Law and the Administrative Code of the City of New York. The court allowed the claims for punitive damages to proceed, noting that punitive damages were available under section 8-502 of the Administrative Code, citing Umansky v Masterpiece Intl. (276 AD2d 692 [2d Dept 2000]; see also Bernstein v 1995 Assoc., 185 AD2d 160 [1st Dept 1992]).
In the instant matter, it is clear that plaintiffs claim she was being ejected from Phoenix House because she is transgender is analogous to a cooperative’s failure to approve a buyer for discriminatory reasons.
*712 In conclusion, the courts in New York State have already-found that under some circumstances, discrimination against one person (as opposed to a class action, or an action brought by the State or City) in a housing discrimination case may rise to “egregious and outrageous” conduct, rather than mere apathy or ignorance. Further, this is more appropriately a matter for the trial judge. As such, the court finds that plaintiffs claim for punitive damages should not be dismissed in a pre-answer motion.
E, Hargrove’s Motion to be Dismissed as a Defendant
Defendants move to dismiss plaintiffs claims against defendant Hargrove individually. Plaintiff claims he aided and abetted Phoenix House’s discrimination in contravention of Executive Law § 296 (6). Defendants argue that because Phoenix House cannot properly be said to have discriminated in any fashion against plaintiff it would be improper as a matter of law to hold an individual employee accountable for violations that did not occur.
Plaintiff responds that dismissal of the section 296 (6) claim would be inappropriate because “Mr. Hargrave [sic] is not a lone defendant in this case,” plaintiffs claims of discrimination against Phoenix House are proper, and Hargrove can be said to have aided and abetted such discrimination.
It seems defendants have argued that since there is no valid claim against Phoenix House, defendant Hargrove cannot be held liable for aiding and abetting Phoenix House. In that the court has already found that plaintiff has stated causes of action against Phoenix House under Executive Law § 296 (18) (2) and (5) (a), and under NYCHRL §§ 8-102 (16) (a) and 8-107 (5) (a), this branch of defendants’ motion is denied.
Conclusion
The branches of defendants’ motion to dismiss plaintiff’s claims under the New York State Human Rights Law (Executive Law § 291 et seq.) and under the NYCHRL (Administrative Code § 8-102 et seq.) are denied. The branch of defendants’ motion to dismiss the plaintiffs claim for injunctive relief under the NYSHRL is granted, but under the NYCHRL is denied. The branch of defendants’ motion to dismiss plaintiffs claim for punitive damages is denied. The branch of defendants’ motion to dismiss the plaintiffs claims as against defendant Hargrove is denied.
*713 Defendants shall serve their answer to the complaint within 30 days.

. Prison Litigation Reform Act, 18 USC § 3626 et seg., as added by Pub L 104-134, 110 US Stat 1321.

. Jeffrey Kosbie, (No) State Interests in Regulating Gender: How Suppression of Gender Nonconformity Violates Freedom of Speech, 19 Wm & Mary J of Women & L 187 (2013).

. In Price Waterhouse v Hopkins (490 US 228 [1989]), the U.S. Supreme Court held that discrimination on the basis of gender stereotypes is sex-based discrimination. The Supreme Court held that title VII barred not just discrimination because of biological sex, but also gender stereotyping — failing to act and appear according to expectations defined by gender. (Id. at 250-251.) In that case, the Court held it was impermissible discrimination for an accounting firm to inform an employee that, to be considered for a promotion, she had to conform to gender stereotypes and “walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled and wear jewelry.” (Id. at 235.)

. A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. “The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior.” (Ilona M. Turner, Sex Stereotyping Per Se: Transgender Employees and Title VII, 95 Cal L Rev 561, 563 [2007]; see also Taylor Flynn, Transforming the Debate: Why We Need to Include Transgender Rights in the Struggles for Sex and Sexual Orientation Equality, 101 Colum L Rev 392, 392 [2001] [defining transgender persons as those whose “appearance, behavior, or other personal characteristics differ from traditional gender norms”].) There is thus a congruence, or overlap, between discriminating against transgender, gender variant or intersex individuals and discrimination on the basis of gender-based behavioral norms. (Glenn v Brumby, 663 F3d 1312, 1316 [2011].)

. http://www.who.int/gender/whatisgender/en/

. Note, Franklin H. Romeo, Beyond a Medical Model: Advocating for a New Conception of Gender Identity in the Law, 36 Colum Hum Rts L Rev 713, 713-717 (2005).

. A thorough exploration of the violence transgender prisoners endure is detailed in Gabriel Arkles, Symposium, Intersections of Transgender Lives and the Law: Safety and Solidarity Across Gender Lines: Rethinking Segregation of Transgender People in Detention, 18 Temp Pol & Civ Rts L Rev 515 (2009).

. It is plaintiffs contention that, while plaintiffs federal suit only named one state law claim — i.e., Executive Law § 296 (18) (2) — it is nonetheless clear from plaintiffs federal complaint that plaintiff, in fact, brought more than one *692 state law claim, though they were not “neatly compartmentalized” on account of plaintiffs pro se status when her complaint was drafted.

. Fed Rules Civ Pro rule 41 (“Dismissal of Actions”).

. The newest version, DSM-Y issued in 2013, is not as yet in the court’s library so the court could not determine if the definition has changed, but this definition in DSM-IV was the definition in use at the time plaintiff was at Phoenix House.

. Medical professionals also reference the Harry Benjamin International Gender Dysphoria Association’s Standards of Care for Gender Identity Disorders, Sixth Version (Feb. 2001), as updated.

. “[T]ransvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, [and] other sexual behavior disorders” are excluded.